**IDAHO WATERSHEDS PROJECT; Committee for Idaho's High Desert, Plaintiffs–Appellees,**

v.

**Martha G. HAHN, State Director; Bureau of Land Management; Jenna Whitlock, Owyhee Area Manager, Defendants,**

and

**Owyhee Resources Area Permittees; Thomas Hook; Connie Brandau; James Randall Collins; Michael F. Hanley, IV; Tim Lowry, Defendants–Intervenors–Appellants.**

**Idaho Watersheds Project; Committee for Idaho's High Desert, Plaintiffs–Appellees,**

v.

**Martha G. Hahn, State Director; Jenna Whitlock, Owyhee Area Manager, Defendants,**

and

**Petan Company of Nevada, Defendant–Intervenor–Appellant.**

Idaho Watersheds Project; Committee for Idaho's High Desert, Plaintiffs–Appellees,

v.

Martha G. Hahn, State Director; Jenna Whitlock, Owyhee Area Manager; Bureau of Land Management, Defendant–Appellants,

and

Owyhee Resources Area Permittees; Thomas Hook; Connie Brandau; James Randall Collins; Baltzor Cattle Company; Michael F. Hanley, IV; Tim Lowry; Petan Company of Nevada, Defendants–Intervenors.

Nos. 01–35033, 01–35150, 01–35152.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 2, 2002.

Filed Sept. 24, 2002.

**820**

Michael J. Van Zandt, Robert L. Zaletel, Anthony L. Francois, McQuaid, Metzler, Bedford & Van Zandt, San Francisco, California, attorneys for Appellants Owyhee Resource Area Permittees, Thomas Hook, Connie Brandau, James Randall Collins, Michael F. Hanley, IV, and Tim Lowry.

John C. Cruden, Acting Assistant Attorney General, David C. Shilton, David J. Lazerwitz, U.S. Department of Justice Environment & Natural Resources Division, Washington D.C., Paul Smyth, Laura Brown, Jean Sonneman, Office of the Solicitor, U.S. Department of the Interior, Kenneth M. Sebby, Office of the Regional Solicitor, U.S. Department of the Interior, attorneys for Appellants Martha Hahn, Jenna Whitlock, and Bureau of Land Management.

W. Alan Schroeder, John T. Schroeder, Schroeder & Lezamiz Law Offices, Boise, Idaho, attorneys for Appellant Petan Ranch.

Laurence J. ("Laird") Lucas, Robert W. Bartlett II, William M. Eddie, Land and Water Fund of the Rockies, Boise, Idaho, attorneys for Appellees Idaho Watersheds Project and Committee For Idaho's High Desert.

Before D.W. NELSON, THOMPSON and PAEZ, Circuit Judges.

## OPINION

D.W. NELSON, Senior Circuit Judge.

Appellee environmental groups Idaho Watersheds Project and Committee For Idaho's High Desert ("Environmental Groups") brought suit in federal district court alleging, *inter alia,* violation of the National Environmental Policy Act ("NEPA") by the Bureau of Land Management ("BLM") in the exercise of its resource management responsibilities and particularly in the issuance of grazing permits to cattle ranchers ("Ranchers" or "Cattle Ranchers") on federal lands in the Owyhee Resource Area ("Owyhee Area" or "Owyhee"). The district court found that the BLM had violated NEPA and granted a permanent injunction imposing interim conditions on grazing and imposing a timetable for the BLM to issue new permits in compliance with NEPA. The Ranchers and the BLM contest the issuance of the injunction. We have jurisdiction pursuant to 28 U.S.C. § 1292 and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Owyhee Resource Area And Cattle Overgrazing

The Owyhee Resource Area covers over one million acres of ruggedly beautiful

landscape in southwestern Idaho bounded on the west by Oregon, on the south by Nevada, and on the north by the Snake River. Deep Creek, South Fork Owyhee Creek, Jordan Creek, Hardtrigger Creek, Reynolds Creek and many other tributaries feed the Owyhee and Snake Rivers, which have sculpted spectacular and wild canyonlands out of the Owyhee's volcanic rock formations.

Remote and traversed by life-giving waterways, the Owyhee provides habitat for bighorn sheep, elk, mule deer, antelope, peregrine falcon, redband trout, sage grouse, and hundreds of other species. Startling in its ecological diversity, from arid sagebrush desert to lush juniper woodlands, the Owyhee shelters the world's largest population of nesting raptors and a variety of rare and endangered species.

Along with supporting a wide variety of wildlife, the Owyhee has supported cattle ranching as a traditional occupation for a century or more. Ranching families are an important part of the local community with many family members participating actively in civic life as local elected officials, volunteer firefighters, and school board members. Well over four hundred people currently depend on cattle grazing in the Owyhee for their livelihood.

Water is life, and the health of the Owyhee depends on the health of its streams. Unfortunately, cattle overgrazing now threatens the life of the Owyhee. In his Memorandum Decision and Order of February 11, 1998 ("Feb.Memorandum"), Chief Judge Winmill succinctly summarized the pernicious effect of cattle overgrazing:

These livestock, the EIS noted, tend to congregate near water. Riparian areas—lands adjacent to streams that support a thicker growth of vegetation—are crucial to the wildlife and fish of the ORA [Owyhee Resource Area]. Fish thrive in streams near healthy riparian areas because vegetation stabilizes the stream banks, keeping sediment out of the water and providing shade that cools the water. Although these riparian areas constitute only one percent of the ORA acreage, wildlife congregate there in much greater concentrations than in any other habitat in the ORA.

When riparian vegetation is overgrazed, lush stream banks turn to bare dirt. Trampled by livestock, the dirt banks crumble into nearby waterways. Water quality deteriorates and water temperatures rise, creating adverse conditions for fish. The stream bank erosion prevents plant growth, ensuring further erosion, and destroying wildlife habitat. In this way, overgrazing ruins not only the habitat benefits of riparian areas, but also the grazing benefits of the ORA.

In 1981 the BLM identified livestock overgrazing as a significant problem in the Owyhee and concluded that approximately ninety percent of the Owyhee rangeland was in poor or fair ecological condition. In 1981, the BLM also found over one hundred and forty miles of streams to be in poor condition, due in large part to overgrazing. In 1996, the BLM again examined the health of the streams in the Owyhee and found that ninety-one percent of the stream miles inventoried were in unsatisfactory condition. Despite the BLM's own findings, the BLM failed to address destruction of riparian habitat caused by cattle overgrazing in the fifteen years between 1981 and 1996 and the condition of stream banks in the Owyhee continued to deteriorate during this period.

## B. The BLM's Management Of The Owyhee

The BLM is statutorily charged with managing the Owyhee and is re-

quired to consider many interests, including livestock grazing. 43 U.S.C. § 1702(c). In 1981, the BLM adopted a master management plan to guide its management of the Owyhee. An Environmental Impact Statement ("EIS") was prepared and adopted along with the 1981 management plan in order to evaluate the environmental impacts of the management plan, including contemplated cattle grazing, as required by NEPA. NEPA imposes procedural requirements upon federal agencies, mandating that the government formally and adequately consider the environmental impacts of proposed federal actions that may have a significant impact on the environment. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

In 1995 major changes were made to substantive grazing regulations governing the BLM, including a new requirement that all ranchers grazing cattle in the Owyhee obtain a grazing permit and undergo an annual reauthorization. 43 C.F.R. § 4140.1(b)(i). The regulations require the BLM to place terms and conditions in the permits to achieve management and resource condition objectives. 43 C.F.R. § 4130.3. As a result of these regulatory changes, the BLM found that most ranchers needed new multi-year permits because they either did not hold a permit or because their permit had expired.

### C. The Sixty-Eight Cattle Grazing Permits Issued In 1997

In 1997, in order to comply with the 1995 regulations, the BLM issued sixty-eight grazing permits covering about one million acres. The BLM sought to comply with NEPA by filling out pre-printed one page forms for each permit, and stating on the form that the permit complied with the then sixteen-year-old EIS that had been adopted in 1981. Grazing on the allot-ments covered by these permits continued uninterrupted and continues today.

### D. The District Court Decision

Subsequent to the permits being issued, the Environmental Groups filed suit alleging violations of the Clean Water Act, NEPA, and other federal statutes and regulations. The Environmental Groups challenged the issuance of the sixty-eight permits in particular and sought in general to force the BLM to institute grazing management changes to bring BLM's practices into conformance with substantive statutory requirements, the BLM's own guidelines for rangeland management, and the general procedural requirements imposed by NEPA. The Environmental Groups additionally sought to force completion of the long delayed new management plan and new EIS. The Petan Company and the Baltzor Cattle Company, and a group of other ranchers styled the Owyhee Resource Area Permittees ("ORAP"), intervened as defendants.

The district court granted partial summary judgment in favor of the Environmental Groups on their seventh claim for relief. The seventh claim for relief asserts that the BLM violated NEPA because it failed to prepare required environmental documentation before issuing the sixty-eight permits. The BLM argued that referencing the permits back to the 1981 EIS was adequate. The court rejected this argument, finding that new and significant environmental impacts of cattle grazing had arisen in the Owyhee since the 1981 EIS had been prepared. The court found that the BLM had not documented the required "hard look" at these new impacts required by *Price Rd. Neighborhood Ass'n v. U.S. Dep't. of Transp.*, 113 F.3d 1505 (9th Cir.1997) and *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d

1372 (9th Cir.1998), and had therefore failed to comply with NEPA.

The district court also considered and rejected BLM's arguments that consideration of the Environmental Groups' challenge was premature because its decision to issue the permits was not final and the Environmental Groups had failed to .exhaust their administrative remedies.

Subsequent to its grant of summary judgment, the district court undertook additional proceedings in order to craft a remedy. In its Memorandum Decision and Order of February 29, 2000 ("Feb. 29 Memorandum"), the district court ultimately issued a permanent injunction requiring the BLM to undertake an environmental review of the sixty-eight permits in conformance with NEPA on an expedited schedule. The district court ordered that the review be completed on identified "high priority" allotments by the end of 2003, and on the other allotments by the end of 2006. The BLM had estimated that without the court's order its review would not be complete on high priority allotments until 2005 and on the balance of allotments until 2010.

Because the environmental effects of the new grazing permits would not be documented for several years in a way that would allow the BLM to impose permit conditions to mitigate those effects, the court also imposed interim measures to protect the environment while the BLM was conducting the expedited environmental reviews.

In order to determine appropriate interim measures, the court requested recommendations from the BLM. The BLM's Supervisory Rangeland Management Specialist, Bill Reimers ("Reimers"), provided a declaration detailing the following four recommendations in response to the court's request:

1) Key herbaceous riparian vegetation, where streambank stability is dependant upon it, will have a minimum stubble height of four inches on the streambank, along the greenline, after the growing season;

2) Key riparian browse vegetation will not be used more than fifty percent of the current annual twig growth that is within reach of the animals;

3) Key herbaceous riparian vegetation on riparian areas, other than the streambanks, will not be grazed more than fifty percent during the growing season, or sixty percent during the dormant season; and

4) Streambank damage attributable to grazing livestock will be less than ten percent on a stream segment.

The court rejected the Environmental Groups' contention that all cattle grazing should be halted and likewise rejected the Ranchers' contention that no interim protections were called for. The court instead took what it considered to be a balanced approach and adopted Reimers's recommendations, which provided protection for the environment and allowed cattle grazing to continue.

## II. STANDARD OF REVIEW

A district court's authority to grant an injunction is reviewed *de novo,* but the court's exercise of that power is reviewed for an abuse of discretion. *Cal. Dep't. of Toxic Substances Control v. Campbell,* 138 F.3d 772, 776 (9th Cir.1998). The scope of injunctive relief is reviewed for abuse of discretion. *Sony Computer Entm't, Inc. v. Connectix Corp.,* 203 F.3d 596, 602 (9th Cir.2000).

## III. DISCUSSION

### A. Overview Of Claims Presented

There are three sets of Appellants in this matter. First, there is the Bureau of

Land Management and related federal officers. BLM focuses its appeal on the single issue of exhaustion. BLM argues that the district court erred in issuing the injunction because the Environmental Groups failed to exhaust their administrative remedies before filing suit as required by statute, regulation, and case law. Second, there is the Petan Ranch ("Petan"). Petan argues that the district court should have dismissed Plaintiff's claims because the agency decisions were not final and the Plaintiffs did not exhaust administrative remedies before repairing to federal court. Petan also argues that the Plaintiffs effectively waived their claims in federal court by dismissing administrative appeals with prejudice. Third, there is ORAP. ORAP argues that the district court should have dismissed Plaintiffs' claims with respect to some of the grazing permits in question because administrative appeals were not exhausted. Among the Appellants, only ORAP also asserts errors in the district court's issuance of the injunction itself, separate and apart from any underlying exhaustion or finality issues.

On the other side, the Environmental Groups argue that this Court has no appellate jurisdiction over any of the exhaustion or finality claims because those issues were disposed of in the partial grant of summary judgment, which is a non-appealable order. The Environmental Groups argue that the appeals of Petan and BLM should be dismissed in their entirety for lack of appellate jurisdiction. The Environmental Groups argue that only those claims of ORAP that assert errors in the issuance of the injunction itself may be heard by this Court.

B. *The Environmental Groups' Jurisdictional Challenge*

■ As described above, the Environmental Groups argue that this Court lacks jurisdiction over the appeal from the district court's partial grant of summary judgment because a partial grant of summary judgment is a non-appealable order. Ordinarily, a summary judgment order that determines liability but not remedies, or that disposes of fewer than all claims, is not a final appealable order. *Toxic Substances Control,* 138 F.3d at 776. However, 28 U.S.C. § 1292(a)(1) confers jurisdiction not only over orders concerning injunctions, but also over matters inextricably bound up with the injunctive order from which appeal is taken. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902, 905 (9th Cir.1995). Jurisdiction extends to *all* matters inextricably bound up with the order from which appeal is taken. *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.,* 913 F.2d 676, 680 (9th Cir. 1990).

■ Here, the district court held in its partial grant of summary judgment that the BLM failed to comply with NEPA in issuing the sixty-eight permits. The district court also held that the decision of the BLM to issue the permits was a "final" agency action and that the Environmental Groups were not required to further exhaust administrative remedies before seeking relief in federal court. These holdings provide the necessary predicate for the court's later grant of injunctive relief to remedy the NEPA violation and are inextricably bound up with the grant of injunctive relief. Therefore this Court has appellate jurisdiction under 28 U.S.C. 1292(a)(1) to hear all the claims presented by all Appellants.

C. *The Ranchers' And BLM's Exhaustion Arguments*

1. *The Administrative Procedure Act's Exhaustion Requirement*

■ Plaintiff's action below was brought under the authority of the Administrative

Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). The APA provides a right of action against agencies and officers of the United States to persons adversely affected or aggrieved by agency actions. 5 U.S.C. § 702. However, before review may be sought in federal court the agency action must be "final." 5 U.S.C § 704. An agency action is not considered final for purposes of § 704 where the agency provides by rule for administrative appeal to a superior agency authority and provides that the action is inoperative while administrative appeal is pending. *Id.* Section 704 thus expresses the administrative "exhaustion" requirement, which applies to all challenges to agency action brought under the APA. *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

■ It is undisputed that the Environmental Groups did not exhaust their administrative appeals. The question before us is whether the BLM's administrative appeal regulations provide procedures that effectively render inoperative the challenged decision pending appeal. If the regulations do not allow for the decision to be rendered inoperative pending administrative appeal, then exhaustion of administrative appeals is not required and the matter was properly before the district court. *Id.*

### 2. The BLM's Exhaustion Regulations

The Interior Board of Land Appeals has administrative jurisdiction over grazing permit appeals. 43 C.F.R. § 4.1(b)(3)(i). The first step in an appeal of a grazing decision is a hearing before an administrative law judge. 43 C.F.R. §§ 4.470–4.478. Any party affected by the administrative law judge's decision has the right to appeal further to the Interior Board of Land Appeals itself. 43 C.F.R. § 4.476.

The Interior Department's regulations provide as follows:

> In order to insure the exhaustion of administrative remedies before resort to court action, a decision which at the time of its rendition is subject to appeal to a superior authority in the Department shall not be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless it has been made effective pending a decision on appeal in the manner provided in this paragraph.

43 C.F.R. § 4.477. The regulations further provide:

> (c) *Exhaustion of administrative remedies.* No decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective in the manner provided in paragraphs (a)(3) or (b)(4) of this section or a decision has been made effective pending appeal pursuant to paragraph (a)(1) of this section or pursuant to other pertinent regulation.

43 C.F.R. § 4.21(c). Under these regulations, the aggrieved party must file not only an appeal but must also file a petition for a stay of the decision pending appeal as well. If the agency grants the stay, then the decision is rendered inoperative pending the administrative appeal. If the agency does not grant the stay, then the aggrieved party may seek recourse in federal court without further pursuing available administrative remedies. If the agency otherwise renders the decision final, the party may also seek immediate recourse in federal court without exhausting administrative remedies. *See* 43 C.F.R. § 4.21.

However, additional BLM regulations provide that even when a stay is granted, grazing will continue if either one of two applicable criteria is met. First, when grazing use was authorized in the previous year grazing will continue at that level even while the stay is in effect. 43 C.F.R. § 4160.3(d)[1] reads in pertinent part as follows:

When the Office of Hearings and Appeals stays a final decision of the authorized officer regarding an application for grazing authorization, an applicant who was granted grazing use in the preceding year may continue at that level of authorized grazing use during the time the decision is stayed, except where grazing use in the preceding year was authorized on a temporary basis under § 4110.3-1(a).

Second, where there was no authorized grazing use in the previous year, the challenged decision remains in full force and grazing continues even while the stay is in effect:

Where an applicant had no authorized grazing use during the previous year, or the application is for designated ephemeral or annual rangeland grazing use, the authorized grazing use shall be consistent with the final decision pending the Office of Hearings and Appeals final determination on the appeal.

43 C.F.R. § 4160.3(d).

*a. If There Was No Lawfully Authorized Grazing In The Previous Year*

■ As the regulations quoted above reveal, where there was no lawfully authorized grazing use in the previous year, the BLM's stay provision is entirely meaningless. In this situation the administrative procedure would be as follows: first the BLM would grant a grazing permit; next the aggrieved party would file an appeal and a contemporaneous application for a stay; a hearing would be held and if the stay were granted grazing would still continue under the terms and conditions of the permit that was being appealed until the appeal was finally decided. This procedure does not render the decision inoperative by any sane reckoning. Where a decision falls under this provision, we hold that an aggrieved party shall be allowed to proceed to federal court without being required to endure further administrative proceedings.

■ While the record is not entirely clear and the BLM appears to take it for granted that there was lawfully authorized grazing in the year prior to the issuance of the sixty-eight permits, it appears that this case may be one in which there was no lawfully authorized grazing use in the year prior to the challenged permits. There may have been no lawfully authorized grazing use in the year prior to the challenged permits because in 1995 the BLM adopted 43 C.F.R. § 4140.1(b)(1)(i), which made it unlawful to graze livestock on public lands "[w]ithout a permit or lease, and an annual grazing authorization." As a result of this regulation, the BLM conducted an investigation of all ranchers grazing livestock in the Owyhee. The investigation revealed, as Reimers explained in his declaration, that "most, but not all [Ranchers], needed new multi-year term permits because they either did not hold a term permit or because their term permit had expired." Apparently, prior to the 1995 regulation, grazing occurred with a

---

**1.** The BLM stated at oral argument that the applicable provision is § 4160.3(e) rather than § 4160.3(d). However, the BLM's reply brief cites to § 4160.3(d) as the relevant provision. In any event, both sections provide that grazing levels in effect the previous year continue where a stay is granted.

less rigorous oversight and permitting process.

Pursuant to the 1995 regulations, if the Ranchers' permits had expired or if the Ranchers did not hold valid permits, then there was no lawfully authorized grazing in 1996—the year prior to the challenged permits. Under this scenario, the Environmental Groups would not be required to exhaust their administrative remedies because where there was no lawfully authorized grazing in the previous year, the BLM's regulations, on their face, do not provide for rendering the agency's decision inoperative pending appeal. *Darby,* 509 U.S. at 152, 113 S.Ct. 2539.

### b. If There Was Lawfully Authorized Grazing In The Year Prior to the Permit Decisions

█ If there was lawfully authorized grazing in the previous year, we hold that exhaustion of administrative remedies is not required on the facts of this case. Even if a stay were to be granted, grazing could continue for many years according to the prior year's grazing practices, which harm riparian habitat because they are based on badly out of date management techniques.[2] In this case, the BLM's "stay" does not render the permit decision inoperative but actually implements an unreviewed decision to renew grazing authorizations and at the same time allows grazing practices that are known to harm the environment.

If a stay were to be granted, grazing would continue according to the management practices in effect prior to 1997. These very same practices, the BLM concluded in 1996, are responsible for the continued destruction of riparian habitat. Yet the record reflects that the pre 1997 grazing practices could continue for many years while appeals work their way through the administrative hearing process. As the Environmental Groups point out, BLM regulations establish no time frames or deadlines for grazing permit appeals to be concluded and administrative appeals can languish for years without decision.[3] Granting of the stay therefore has the effect of a multi-year renewal of grazing permits without environmental review and without imposing any measures to protect the environment while appeals are pending.

█ This result does not provide that "the action is meanwhile inoperative" as required by the APA but rather is a backhanded way of granting an ongoing permit—while also evading the BLM's own 1995 regulations requiring enhanced permit review and evading NEPA.[4] Because under the facts of this case the BLM's

2. A large part of plaintiffs' lawsuit challenges not only BLM's issuance of these sixty-eight permits but the BLM's entire *modus operandi* of long delays in conducting appropriate environmental review of grazing practices. The district court held in its Feb. 29 Memorandum that the interim protective measures were necessary in part because of the "decades-long series of past delays" in conducting appropriate environmental reviews in this case.

3. The Ranchers themselves have provided examples of grazing permit appeals pending for years without decision.

4. NEPA requires "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available" to the public. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Yet the BLM's regulations allow it to effectively renew grazing authorizations, paradoxically by granting a stay, while ignoring scientific information that demonstrates harm to vital habitat caused by outdated grazing practices.

regulations render the decision "inoperative" in name only, while in fact implementing an unreviewed decision, we hold that exhaustion is not required.[5]

#### D. The Rancher's Arguments That The BLM's Decision Was Not Final And Therefore Not Subject To Judicial Review

Rancher Petan argues that the decision to issue the permits lacked finality and therefore the district court should have dismissed the Environmental Groups' claims. This contention tends to blur the doctrines of exhaustion and finality. To the extent that Petan argues that the decision fails the finality requirement, Petan is incorrect.

The Supreme Court has explained the distinction between finality and exhaustion:

[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the de-

cision is found to be unlawful or otherwise inappropriate.

*Darby,* 509 U.S. at 144, 113 S.Ct. 2539(quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 193, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)).

■ Here, the initial agency decisionmaker arrived at a definitive position and put the decision into effect by issuing the sixty-eight permits and allowing actual grazing to occur under the terms of those permits. Rancher Petan concedes as much in its opening brief, stating that "the Final Decision was implemented after the thirty day inoperative period." Petan devotes a separate section of its brief to the Environmental Groups' failure to exhaust administrative remedies. To the extent that Petan's arguments go to the exhaustion issue, they are treated at section III(C) above.

#### E. Effect Of Idaho Watersheds Project Filing And Dismissing Administrative Appeals

Rancher Petan argues that it was error for the district court not to dismiss because one of the Environmental Groups, Idaho Watersheds Project, filed and then dismissed administrative appeals of the

---

**5.** The Environmental Groups also argue that BLM's regulations fail to render agency decisions inoperative pending appeal because they vest discretion in the agency to stay the decision pending appeal, while the APA requires that the decision must be automatically rendered inoperative once an administrative appeal is filed. At least one district court has agreed with this position. *Or. Natural Desert Ass'n v. Green,* 953 F.Supp. 1133, 1141–42 (D.Or.1997). However, we are reluctant to intrude on an agency's control over its administrative appeals process when it is not necessary to decide the case before us. Because we are able to decide on the facts of this case that exhaustion was not required, we decline to reach the facial validity of the stay provision set forth at 43 C.F.R. § 4.21(c).

The Environmental Groups further argue that we may "waive" exhaustion requirements for sound prudential reasons, where exhaustion is a non-jurisdictional statutory requirement, in the same way that we might decline to require exhaustion of administrative remedies in the context of a judicially crafted exhaustion doctrine. The Environmental Groups correctly characterize 5 U.S.C. § 704 as a non-jurisdictional statutory exhaustion requirement. *See* section III(F) *infra.* However, we decline to reach the Environmental Groups' arguments concerning our authority to waive this statutory requirement.

same issues brought in federal court. Petan relies on *Acura of Bellevue v. Reich*, 90 F.3d 1403(9th Cir.1996), to support this argument. *Acura*, however, does not help Petan in the present case. In *Acura*, this Court held that the filing of an optional administrative appeal rendered the initial agency decision nonfinal for purposes of the APA and that the plaintiff could not pursue a suit in federal court. *Acura*, 90 F.3d at 1407. The court in *Acura* reasoned that even though the appeal in that case was optional, i.e., not required by statute or regulation, once the aggrieved party filed the appeal the initial agency decision could have been modified or reversed and was therefore nonfinal for purposes of the APA. *Id.* at 1408. If a federal court were to step in and rule on the issues in such a situation, it would inappropriately interfere with the agency's decision making process before it was completed.

■ Here, Environmental Group Idaho Watersheds Project dismissed its appeals so the agency's decision making process *was* completed, and the agency decision was *not* subject to being modified or reversed. *Acura* relies in large part on *Stone v. Immigration and Naturalization Service*, 514 U.S. 386, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995). In *Stone* the Supreme Court held that "pendency of reconsideration renders the underlying decision not yet final, and it is implicit in the tolling rule that a party who has sought rehearing cannot seek judicial review until the rehearing has concluded." *Id.* at 392, 115 S.Ct. 1537. Here, no reconsideration was

pending because the appeal was concluded by dismissal.

The Environmental Groups further point out that while Idaho Watersheds Project did file and then dismiss administrative appeals, the other Environmental Group, Committee For Idaho's High Desert, did not file any administrative appeals. Since both groups challenge all the permits, any holding on the effect of filing and then dismissing administrative appeals (discretionary or otherwise) would not affect the outcome of this case.

For the foregoing reasons, we hold that the filing and dismissing of administrative appeals by Idaho Watersheds Project does not affect its ability to pursue its case in federal court.[6]

### F. The Rancher's Pending Administrative Appeals With Respect To Ten Of The Permits

While the Environmental Groups have brought this lawsuit because they believe the permits do not contain restrictions on cattle grazing that are stringent enough, some of the Ranchers brought administrative appeals of the same permits because they believe that the restrictions contained in the permits are too stringent.

■ ORAP and Ranchers Thomas Hook, Connie Brandau, James Randall Collins, Michael F. Hanley IV, and Tim Lowry argue that because ten of their number had their own administrative appeals pending when the Environmental Groups filed suit, the agency actions were

---

**6.** Appellants also allege that with respect to five of the permits, Idaho Watersheds Project did not dismiss the appeals, and that the dismissals of the other permits were without prejudice. Elsewhere, Appellants argue that because the appeals *were* dismissed with prejudice, the Environmental Groups' claims in federal court with respect to these permits have been waived. Idaho Watersheds, on the other hand, contends that it made clear its intent to dismiss all appeals and failure of BLM to dismiss any appeals was due to a mix up of appeal numbers between Idaho Watersheds and the BLM. In any event, these issues are either raised by Appellants in passing or not adequately argued and supported; therefore we decline to address them.

not final as to those ten permits and the APA precluded judicial review. The Environmental Groups counter that the Ranchers did not raise this argument below and have waived it. Ordinarily, we do not consider matters raised for the first time on appeal. *Janes v. Wal–Mart Stores Inc.*, 279 F.3d 883, 887 (9th Cir.2002).

Anticipating the waiver problem, the Ranchers assert that because the agency action was not final the district court lacked subject matter jurisdiction, and point out that subject matter jurisdiction may be raised at any time, even on appeal. The Ranchers argue in essence that because the APA confers a grant on federal courts of subject matter jurisdiction, failure to meet the APA's requirements, such as the exhaustion requirement, deprives the federal courts of subject matter jurisdiction. The Ranchers cite *Ma v. Reno*, 114 F.3d 128, 131 (9th Cir.1997), for the proposition that pending administrative appeals render decisions non-final and deprive federal courts of subject matter jurisdiction.

■■■ While the Ranchers are correct that subject matter jurisdiction may be raised at any time, *Attorneys Trust v. Videotape Computer Products, Inc.*, 93 F.3d 593, 594–95 (9th Cir.1996), the fact that an agency decision is not final under the APA is not a defect in subject matter jurisdiction.[7] A good deal of confusion among courts and litigants has been spawned by Congress' choice of words in the APA. The APA allows that agency actions meeting certain criteria are "subject to judicial review." 5 U.S.C. § 704. However, the Supreme Court has made it clear that the phrase "subject to judicial review" does not confer a grant of subject

matter jurisdiction. In *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Supreme Court settled a long standing controversy by holding that 28 U.S.C. § 1331, rather than the APA, confers jurisdiction on federal courts to review agency action. *Id. See also* Jerry L. Mashaw et al., *Administrative Law* 833 (1998) (explaining that § 1331 confers jurisdiction for relief against unlawful agency action).

■■■ Because the Ranchers did not raise this argument below, and it does not implicate subject matter jurisdiction, it is waived and we decline to consider it.

*G. The District Court's Imposition Of Interim Protective Measures Without Holding An Evidentiary Hearing*

■■■ Ranchers ORAP argue that a permanent injunction may not issue without an evidentiary hearing if one is requested. The principle authority cited by the Ranchers is *United States v. Microsoft*, 253 F.3d 34, 101–103 (D.C.Cir.2001). In *Microsoft*, the court held that District Judge Jackson erred by failing to hold an evidentiary hearing in the remedy phase of the antitrust trial. *Id. Microsoft* and the cases cited therein allow for exceptions to the requirement for an evidentiary hearing only when facts are not in dispute or when parties waive an evidentiary hearing. *Id.* The Ranchers also cite several other out-of-circuit cases for the same proposition.

The present case differs from *Microsoft* (and the usual injunctive setting) in that defendant BLM, which was subject to the injunction, itself proposed the terms of the interim protective measures. The Ranchers, as defendant intervenors, are certainly affected by the interim measures as are

---

**7.** *Ma* does posit the issue as one of subject matter jurisdiction. *Id.* at 131. However, *Ma* cites no authority to support this classification, and whether the issue in *Ma* was classified as subject matter jurisdiction or otherwise does not appear to have been crucial to the outcome reached in *Ma's* abbreviated opinion.

plaintiff Environmental Groups. However, the district judge declined to accept the arguments advanced by both the Environmental Groups and the Ranchers and instead adopted the recommendations of the BLM. In a variety of settings, including protection of the environment, the Ninth Circuit has shown considerable deference for factual and technical determinations implicating substantial agency expertise. *See, e.g., Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 667(9th Cir.1998). Here the district court rejected what it viewed as "drastic" proposals from the Environmental Groups and deferred to the considerable agency expertise of the BLM in adopting interim rangeland management measures.

Most importantly, this case also differs from the normal injunctive setting because even though the district court's order is termed a "permanent injunction" we deal here only with interim, not permanent, measures. The interim measures (which are the subject of this appeal) are to be in place only so long as it takes for the BLM to conduct the environmental studies required by law so that it can properly determine, exercising appropriate discretion with extensive input from the Ranchers and the Environmental Groups, what measures should be implemented permanently.

The Ranchers argue that the interim measures are not supported by scientific study, and that the Environmental Groups' and the Ranchers' respective scientific experts should battle it out at an evidentiary hearing. However, determining what measures are needed through extensive fact intensive inquiry is precisely the purpose of the long term environmental review ordered by the district court and to which no party objects. It would be odd to require the district court to conduct an extensive inquiry, which would by nature involve scientific determinations, in order to support interim measures that are de-

signed to temporarily protect the environment while the BLM conducts studies in order to make the very same scientific determinations. The district court aptly summarized the catch-22 effect of the Ranchers' argument for an evidentiary hearing on the interim measures in its Memorandum Decision and Order of December 13, 2000("Dec. 13 Memorandum").

> Any evidentiary hearing held by the Court would simply duplicate the efforts the BLM is undertaking and would further divert scarce resources from the BLM, making it more difficult for the BLM to meet the Court's schedule. As the Court has observed in past decisions, the BLM is operating with limited resources and will be stretched very thin just to meet the Court—imposed review schedule. ORAP will obtain its allotment-by-allotment review—it will be done by the BLM rather than this Court, however, which makes eminent sense given the BLM's expertise and authority in this field.

We agree with Judge Winmill's reasoning. Because these are interim measures designed to allow for a process to take place which will determine permanent measures, and all parties will have adequate opportunity to participate in the determination of permanent measures (and if need be challenge the outcome in court), we hold that an evidentiary hearing was not required on the facts of this case.

> *H. The Ranchers' Arguments That The District Court Applied The Wrong Standard, Abused Its Discretion, And Failed To Make Adequate Findings Of Fact And Conclusions Of Law In Issuing And Determining The Scope Of The Injunction*

> *1. Standards Applied By The District Court*

Ranchers ORAP argue that the district court incorrectly applied mandamus stan-

dards and failed to consider the traditional tests for mandatory injunctive relief, which it argues are required in environmental cases.

To the extent that the Ranchers argue that the district court applied a mandamus test instead of the traditional tests for injunctive relief, the district court made clear that its approach was to ensure that the remedy would satisfy both standards. The district court did not seek to substitute mandamus standards for traditional standards but stated in its Dec. 13 Memorandum that "even if the mandamus requirements must be met, they are satisfied in this case."

The district court noted that 5 U.S.C. § 703 expressly authorizes the use of mandatory injunctions. The court then referred to *Or. Natural Res. Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir.1995), in which this Court held that "[w]hen the effect of a mandatory injunction is the equivalent of mandamus, it is governed by the same standard." The district court, however, observed that this Court's opinion in *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061(9th Cir.1997), left some doubt as to whether injunctions issued pursuant to § 703 of the APA should be tested under mandamus or traditional mandatory injunction standards: "[M]andamus relief and relief under the APA are in essence the same; as a result we elected to analyze the claim under the APA [rather than applying mandamus standards]." *Id.* at 1065(internal quotations and citations omitted). The district court then proceeded to employ a "belt and suspenders" approach, testing both standards.

### 2.  The Mandamus Standard

This Court has stated the elements that must be satisfied before mandamus may issue as follows: (1) the plaintiff's claim is clear and certain; (2) the defendant official's duty is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available. *Vanderbilt*, 113 F.3d at 1065 n. 5.

The Ranchers argue that the interim measures could not be imposed under a mandamus standard because under mandamus a court may only order government officials to perform duties that are purely ministerial in nature, and may not command the performance of discretionary duties.

While it is true that the writ of mandamus is chiefly used to compel the performance of a ministerial duty, "[i]t also is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion." *Miguel v. McCarl*, 291 U.S. 442, 451, 54 S.Ct. 465, 78 L.Ed. 901 (1934). *See also Federal Procedure, Lawyers Edition* § 20:662 (1992 & Supp.2001).

Here, while it was the district court and not the BLM that imposed the interim measures, the court arguably compelled the BLM to undertake actions involving judgment and discretion in enforcing the interim measures. The court did not, however, direct the exercise of that judgment or discretion. Rather, the court determined that the BLM had violated NEPA and then deferred to the expertise of the agency in determining what interim measures would be required until the NEPA violation could be cured. As Ranchers ORAP succinctly state it in their reply brief, "[t]he Court below imposed the terms and conditions at the suggestion of the BLM, and it was the BLM, not the Court, which devised the terms and conditions." In its Dec. 13 Memorandum the district court also allowed the BLM to retain "broad discretion in enforcement matters. If application of the interim

terms in a specific situation would be unjust, ineffective, or unreasonable, the BLM has the discretion to meet with the permit holder and work out a fair result." The district court thus urged the BLM to proceed to the exercise of its discretion but did not direct the exercise of that discretion in a particular way.

■ The Ranchers also assert that mandamus standards were not met because other adequate remedies were available to redress the NEPA violation. The Ranchers assert that the court's imposition of a timetable on the BLM to complete the environmental review required by law on the sixty-eight permits was a complete remedy and nothing further was appropriate. However, the point of the environmental review is to determine what measures are needed to protect the environment from harm due to cattle grazing. If grazing is to continue (as the Ranchers insist it should) while the environmental studies necessary to determine long term protective measures are underway, some 'best estimate' of interim environmental protections is required to remedy the violation. In the run of the mill NEPA case, the contemplated project, whether it be a new dam or a highway extension, is simply delayed until the NEPA violation is cured. This case presents a different scenario, and simply ordering completion of the required environmental studies would not provide an adequate remedy because environmental harm from grazing would continue during the six years required (under the district court's expedited timetable) to complete the environmental studies.

### 3. Traditional Injunction Standards

■ The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest. *Id.*

### a. Irreparable Injury And Inadequacy Of Legal Remedy

■ During the course of this protracted litigation, the district court repeatedly noted the ecological harms caused by cattle grazing without adequate protective measures. The BLM's own studies, entered into the record before the district court, document environmental harm caused by cattle grazing without adequate protective measures over a fifteen year period. The record therefore supports the likelihood of continued injury absent adequate protective measures. "If such [environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396. Environmental injury of "long duration," here ongoing for at least fifteen years and expected for at least another six years until the required studies are completed, is "irreparable." *Id.* There is no remedy at law that would protect the environment during the period the interim protective measures have been ordered.

### b. Balancing The Equities

■ The district court considered the hardship of a complete halt to grazing and concluded that such a remedy would be too drastic. Instead, the court specifically requested and had before it a declaration from the BLM assessing the proposed interim measures. Reimers' declaration states in pertinent part that "[t]he livestock permittee would not be adversely effected [sic] if the above terms and conditions are ordered unless BLM determined that livestock had caused resource damage and/or the permittee failed to meet other

terms and condition [sic] of the permit." The Environmental Groups originally asked for a complete halt to all grazing. The Ranchers now protest the interim measures as too harsh. The record reflects that the district court adopted a middle ground approach and was mindful of the equities on all sides, imposing the interim measures in order to avoid the harsh consequences to the Ranchers of stopping all grazing. As noted above, the district court has allowed that if the interim measures prove unjust in a specific situation the BLM has authority to work out a fair result with the affected Rancher. District Judge Winmill has done an admirable job of ensuring an equitable result in a difficult situation.

### c. Public Interest

■ The district court adopted the interim measures proposed by the BLM, which were designed, as Reimers verified in his declaration, to "ensure virtually no irreversible or irretrievable loss of public resources," and at the same time allow grazing to continue availing the public of whatever benefits flow from the grazing of cattle on public lands.

### 4. Sufficiency Of The District Court's Orders To Meet The Requirements For Findings Of Fact And Conclusions Of Law To Support Issuance Of An Injunction

■ The Ranchers argue that the district court failed to make findings of fact and conclusions of law adequate to support

issuance of the injunction. We reject the Ranchers' arguments on this score because the findings of the district court are "sufficiently specific to permit fair appellate review of the manner in which the trial court resolved the issues upon which its judgment depends." *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 532 (9th Cir. 1962). *See also Century Marine Inc. v. United States,* 153 F.3d 225, 231(5th Cir. 1998) (holding that findings of fact are sufficient if "the district court's findings give the reviewing court a clear understanding of the basis for the decision"). The district court's finding of the NEPA violation in the summary judgment order,[8] the recitation of damage caused by livestock grazing in that order, and the analysis contained in the order granting the injunction and denying the motion for reconsideration make abundantly clear the facts upon which the district court relied. Indeed, these findings far surpass the level of findings and conclusions required by the out-of-circuit authority cited by the Ranchers. *United States v. Rohm & Haas Co.,* 500 F.2d 167, 177 (5th Cir.1974).

### 5. The Ranchers' Vagueness Arguments And Abuse Of Discretion Claims

■ The Ranchers also argue that the terms of the injunction are too vague to be enforceable. However, the BLM devised the terms and is responsible for enforcing them. BLM has not objected to the terms, and they appear quite clear on their face. The court also was specific as to

---

8. The Ranchers argue that neither the order granting the permanent injunction nor the order denying the motion for reconsideration set out adequate findings of fact. The Ranchers ignore the order granting summary judgment. Where, as here, a permanent injunction has been coupled with an order granting summary judgment, the Ninth Circuit has looked to the summary judgment order to determine what the district court considered in devising the injunction. *Continental Airlines Inc. v. Intra Brokers, Inc.,* 24 F.3d 1099, 1102 (9th Cir.1994).

which permits the injunction applies to, excluding a number of Ranchers by name and permit number in the Dec. 13 Memorandum. The evidence does not support the contention that the court abused its discretion in applying BLM's recommendations in devising the injunction.

## IV. CONCLUSION

This Court has appellate jurisdiction to hear all the claims presented by all of the Appellants because the claims concern matters inextricably bound up with the district court's injunctive order. Exhaustion of administrative remedies is not required because in this case the BLM's regulations do not allow for the agency decision to be rendered inoperative pending administrative appeal. The decision of the BLM was final and appropriate for judicial review because the initial agency decisionmaker arrived at a definitive position and put the decision into effect. The filing and dismissing of administrative appeals by Idaho Watersheds Project does not affect its ability to pursue its case in federal court. The Ranchers' claims regarding their own pending administrative appeals were not raised below and are waived. On the facts of this case, an evidentiary hearing was not required. The district court had proper legal authority to issue the injunction, used the correct standards, made adequate findings of fact and conclusions of law, and did not abuse its discretion in determining the scope of the injunction.

The interim measures imposed by the district court are a fair and balanced interim remedy, giving due regard to protection of the environment and the welfare of the affected ranching families.

**AFFIRMED.**