**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTHEAST ALASKA CONSERVATION
COUNCIL; et al.,
              *Plaintiffs-Appellants,*

              v.

UNITED STATES ARMY CORPS OF
ENGINEERS; et al.,
              *Defendants-Appellees,*

COEUR ALASKA, INC.; et al.,
  *Defendants-Intervenors-Appellees.*

No. 06-35679

D.C. No.
CV-05-00012-J-JKS
District of Alaska,
Juneau

ORDER

Filed March 16, 2007

Before: Procter Hug, Jr., A. Wallace Tashima, and
Susan P. Graber, Circuit Judges.

## ORDER

Appellee U.S. Army Corps of Engineers' ("Corps") Emergency Motion Under Circuit Rule 27-3 for Authorization Under the Injunction Pending Appeal to Permit Construction of a Western Interceptor Ditch is denied.[1]

This motion comes to us in a case in which Appellant Southeast Alaska Conservation Council ("SEACC") has appealed a grant of summary judgment in favor of the Corps and the U.S. Forest Service. SEACC challenges the Corps' issuance of a permit, pursuant to § 404 of the Clean Water

---

[1]The parties' motions to exceed the page limits of their respective briefs are hereby granted.

Act of 1972, to Coeur Alaska, Inc. for the discharge of approximately 210,000 gallons of slurry (including 1,444 tons of mine tailings) per day from its froth-flotation mill operation at the Kensington Gold Mine into Lower Slate Lake, a 23-acre lake in the Tongass National Forest in Southeast Alaska. The discharge ultimately will raise the bottom of the lake 50 feet to its current high water mark and nearly triple its surface area. Coeur Alaska and the Corps admit that the discharge and settling of tailings into the lake will kill all of the fish and nearly all other aquatic life, primarily due to their being covered by the discharged material. In addition, the toxicity of the tailings may have lasting effects on the lake and may have a negative effect on its ability to sustain aquatic life in the future. As a result, the extent to which aquatic life could eventually be restored is unclear.

To prepare the lake for the disposal of tailings and the consequent expansion of the lake's surface area, Coeur Alaska intends to construct a 90-foot high, 500-foot long dam at the lake's outfall point. Construction of the dam has already begun. After SEACC filed its appeal in this case, Coeur Alaska built a temporary "coffer dam," approximately 20 feet high, which it admits was always intended to be temporary and was not designed to withstand long-term use. Coeur Alaska had begun construction of a sturdier 38-foot high earthen dam behind the coffer dam when this court halted further construction at the site pending the outcome of this appeal. Coeur Alaska's long-term plan to use the lake as a disposal site also includes the construction of a diversion ditch nearly identical to that proposed in the Corps' emergency motion.

Work ceased on the dam, and at the rest of the site, when this court granted the injunction pending appeal in favor of SEACC. *See SEACC v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1099 (9th Cir. 2006). That order enjoined Coeur Alaska, the Corps, and the Forest Service from activities relating to the construction of a disposal facility at Lower Slate

Lake. *Id.* On August 4, 2006, the district court entered a judgment denying SEACC's requested injunction to prevent the implementation of the Coeur Alaska plan to dump the tailings into Lower Slate Lake. Three days later, SEACC filed a notice of appeal. Coeur Alaska apparently commenced building the temporary coffer dam after the district court entered judgment. This act obviously was undertaken knowing an appeal was pending. On August 24, this court entered its injunction pending appeal, prohibiting Coeur Alaska, the Corps, and the Forest Service from proceeding further with construction of facilities to implement the proposed plan to dispose of tailings into the lake. The temporary coffer dam was thus constructed between the time of the district court's judgment on August 4, 2006, and the time of the injunction on August 24, 2006. It appears there was a rush to construct the temporary dam during this 20-day period even though an appeal was pending.

It was not until November 7, 2006, in its motion to vacate the injunction, that Coeur Alaska raised its concerns about the possible effect of weather on the integrity of the dam. *Id.* The motion was denied. We held that SEACC had argued persuasively that the Corps' permit to Coeur Alaska violates the Clean Water Act and that the construction would adversely affect the environment by destroying trees and other vegetation, and by killing aquatic life. At the time, we directed the parties to meet and consider how best to address the threat posed by weather conditions to the integrity of the temporary coffer dam.[2] *Id.* The parties met, but disagreed regarding how to address the perceived threat to the integrity of the temporary coffer dam. Now, the Corps seeks this court's authorization of a plan involving the construction of a diversion ditch known as the Western Interceptor Ditch ("WID"). Coeur Alaska is actually advocating the plan, but the Corps has conditionally approved the plan and now asks for this court's

---

[2]SEACC disputes whether the spring freshet actually poses a threat to the integrity of the site or to downstream water quality.

authorization. For the reasons discussed below, we do not authorize such a plan.

Coeur Alaska's ditch plan violates both the letter and the spirit of the injunction. That injunction prohibits the Corps, the Forest Service, and Coeur Alaska "from authorizing, allowing, or conducting any further construction activities relating to the use of Lower Slate Lake as a disposal site for mine tailings, including, but not limited to, cutting trees, building roads, clearing vegetation, excavating or filling wetlands, building dams or other structures, diverting streams, or altering the natural water level of Lower Slate Lake or the natural flow of East Fork Slate Creek, until further notice of this court." Yet Coeur Alaska's plan would require cutting trees on 7.6 acres of forested land, building a 30-foot wide road, excavating and digging a 3,000-foot ditch, filling in 4.5 acres of nearby wetlands with 28,800 cubic yards of fill material, diverting natural surface water and groundwater flow, altering the natural level of the lake (which would normally rise during the freshet), bypassing a portion of the creek, and altering the natural flow of the creek (which would increase greatly during the freshet). This plan clearly does not comply with the injunction.

In approving Coeur Alaska's ditch plan, the Corps has disregarded the purpose of the original injunction, which was to prevent further environmental degradation of the site pending the outcome of this appeal. *Id.* at 1100. In its motion to vacate the injunction, Coeur Alaska sought permission to bolster the coffer dam situated at the outfall point of the lake so that it would not breach during the spring freshet. *Id.* at 1101. That plan is less environmentally harmful than the current plan of clearing a swath of trees around the lake, digging a large ditch, installing a liner, constructing a service road, and filling in wetlands. It is also important to reiterate that the ditch plan is part of Coeur Alaska's long-term plan to use the lake as a disposal facility. Granting the Corps' motion would allow Coeur Alaska to begin preparing the site for disposal prior to

this court's resolution of the appeal. For that reason, the plan would not maintain the status quo, which is the whole point of the injunction, but rather would allow Coeur Alaska to begin working to a significant extent on its overall plan. This proposal is not consistent with the injunction.

It is the integrity of the temporary coffer dam that Coeur Alaska rushed to construct in the twenty days between the district court judgment on August 4, 2006, and the entry of the injunction on August 24, 2006, that is at issue. Rather than address the dangers it perceived to the integrity of the dam by removing the hastily constructed temporary dam, or constructing spillways, or utilizing other means to resolve the problem created by the construction of the dam, Coeur Alaska seeks to fashion a remedy that furthers its intention of disposing of tailings in Lower Slate Lake. The remedy for any perceived weather problems should be addressed to the integrity of the dam itself, as our prior order provided.

In order to guide compliance with this order, we believe it is appropriate to announce at this time that we intend to reverse the district court, vacate the permits and the Record of Decision ("ROD") authorizing the use of Lower Slate Lake as a disposal facility, and remand to the district court with instructions to enter summary judgment in favor of SEACC. We have already stated that "SEACC has shown a likelihood of success on the merits because it has argued persuasively that the Corps' permit to Coeur Alaska violates the Clean Water Act." 472 F.3d at 1100.

In issuing its permit to Coeur Alaska for the use of Lower Slate Lake as a disposal site, the Corps violated the Clean Water Act. The discharge from Coeur Alaska's froth-flotation mill operation facially meets the Corps' current regulatory definition of "fill material" because it would have the effect of raising the bottom elevation of the lake. Accordingly, the discharge would be subject to the permit process governed by § 404 of the Clean Water Act. *See* 33 C.F.R. § 323.2(e); 40

C.F.R. § 232.2. Previously, however, EPA promulgated an effluent limitation and standard of performance ("performance standard"), pursuant to §§ 301 and 306 of the Clean Water Act, that prohibits discharges from froth-flotation mills into waters of the United States. *See* 40 C.F.R. § 440.104(b)(1). This very specific regulation applies to Coeur Alaska's mill. Although it would appear that EPA's performance standard conflicts with the Corps' regulatory definition of "fill material," §§ 301 and 306 clearly state that EPA's effluent limitations and standards of performance shall apply to all discharges. *See* 33 U.S.C. §§ 1311(e), 1316(e); *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 (1977). Neither § 301 nor § 306 makes an exception for discharges that would otherwise qualify for a permit under § 404. *See* 33 U.S.C. §§ 1311, 1316. And the regulation clearly states that the zero-discharge performance standard for froth-flotation mills will apply to all new sources. *See* 40 C.F.R. § 440.104. Section 404 itself provides for no exceptions to effluent limitations or standards of performance, even though it does provide for exceptions to other portions of the Clean Water Act. *See* 33 U.S.C. § 1344(f).

The performance standard governs because it is more specific. *See California v. United States*, 215 F.3d 1005, 1013 (9th Cir. 2000) (citing *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 158 (1976)). Unlike the fill rule, which pertains to fill generally, the performance standard covers froth-flotation mills precisely. *See* 40 C.F.R. § 440.104. Moreover, the performance standard took into account the fact that discharges from froth-flotation mills contain both solids and liquids because froth-flotation mills always produce such a mixture. *See* 47 Fed. Reg. 25,682, 25,685 (June 4, 1982) ("Mill process wastewater is characterized by very high suspended solids levels (often in the percent range rather than milligrams per liter) . . . .").

Furthermore, statements made by the Corps and EPA at the time they promulgated the current regulatory definition of

"fill material" in 2002 indicate that effluent limitations and standards of performance should govern where applicable. In fact, the preamble to the fill rule makes clear that the same practices already in place would continue to apply to effluents regulated under §§ 306 and 402. *See* 67 Fed. Reg. 31,129, 31,135 (May 9, 2002). If the agencies had intended for the current regulatory definition of "fill material" to trump EPA's performance standard, the agencies failed to comply with the requirements of the Administrative Procedure Act because they did not specifically state such an intent. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983). Additionally, statements made by the agencies during the course of evaluating Coeur Alaska's permits for the Kensington Gold Mine demonstrate that EPA's performance standard for froth-flotation mills was meant to apply in this case. Therefore, the Corps' permit to Coeur Alaska should be vacated, as should the ROD approving Coeur Alaska's plan of operations.[3]

Because we intend to reverse and vacate the ROD and permits, all construction-related activities furthering the implementation of Coeur Alaska's plan of disposing tailings into Lower Slate Lake should cease and not be undertaken. Coeur Alaska and the Corps have the responsibility to address the integrity and/or removal of the temporary coffer dam itself.

---

[3]We plan to publish an opinion in this case that will explain the reasons for our holding in greater detail.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2007 Thomson/West.