**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

The Northern Cheyenne Tribe, a
federally recognized Indian tribe;
Native Action, a Montana non-
profit corporation,
                *Plaintiffs-Appellants,*

                    v.

Gale Norton, Secretary of the
Interior; Kathleen Clarke,
Director, Bureau of Land
Management; Martin Ott,
Montana State Director, Bureau of
Land Management,
                *Defendants-Appellees,*

Fidelity Exploration and
Production Company; Anadarko
Petroleum Corporation; Devon
Energy Corporation; Powder
River Gas LLC; Pinnacle Gas
Resources, Inc.,
                *Defendants-Intervenors-*
                        *Appellees.*

No. 05-35408

D.C. No.
CV-03-00078-RWA

12153

Northern Plains Resource
Council,
                *Plaintiff-Appellant,*

                v.

Gale Norton, Secretary of the
Interior; Kathleen Clarke,
Director, Bureau of Land
Management; Martin Ott,
Montana State Director, Bureau of
Land Management; United States
Bureau of Land Management,
                *Defendants-Appellees,*

Fidelity Exploration and
Production Company; Anadarko
Petroleum Corporation; Devon
Energy Corporation; Powder
River Gas LLC; Pinnacle Gas
Resources, Inc.,
                *Defendants-Intervenors-*
                        *Appellees.*

No. 05-35413
D.C. No.
CV-03-00069-RWA

THE NORTHERN CHEYENNE TRIBE, a
federally recognized Indian tribe;
NATIVE ACTION, a Montana non-
profit corporation; NORTHERN
PLAINS RESOURCE COUNCIL,
            *Plaintiffs-Appellees,*

                v.

GALE NORTON, Secretary of the
Interior; KATHLEEN CLARKE,
Director, Bureau of Land
Management; MARTIN OTT,
Montana State Director, Bureau of
Land Management; UNITED STATES
BUREAU OF LAND MANAGEMENT,
            *Defendants-Appellants,*

                and

FIDELITY EXPLORATION AND
PRODUCTION COMPANY; ANADARKO
PETROLEUM CORPORATION; DEVON
ENERGY CORPORATION; POWDER
RIVER GAS LLC; PINNACLE GAS
RESOURCES, INC.,
            *Defendants-Intervenors.*

No. 05-35540

D.C. Nos.
CV-03-00069-RWA
NV-03-00078-RWA

THE NORTHERN CHEYENNE TRIBE, a
federally recognized Indian tribe;
NATIVE ACTION, a Montana non-
profit corporation; NORTHERN
PLAINS RESOURCE COUNCIL,
                    *Plaintiffs-Appellees,*

v.

GALE NORTON, Secretary of the
Interior; KATHLEEN CLARKE,
Director, Bureau of Land
Management; MARTIN OTT,
Montana State Director, Bureau of
Land Management; UNITED STATES
BUREAU OF LAND MANAGEMENT,
                            *Defendants,*

and

FIDELITY EXPLORATION AND
PRODUCTION COMPANY,
                *Defendants-Intervenors-*
                            *Appellant.*

No. 05-35586

D.C. Nos.
CV-03-00069-RWA
CV-03-00078-RWA

THE NORTHERN CHEYENNE TRIBE, a
federally recognized Indian tribe;
NATIVE ACTION, a Montana non-
profit corporation; NORTHERN
PLAINS RESOURCE COUNCIL,
                    *Plaintiffs-Appellees,*

                    v.

GALE NORTON, Secretary of the
Interior; KATHLEEN CLARKE,
Director, Bureau of Land
Management; MARTIN OTT,
Montana State Director, Bureau of
Land Management; UNITED STATES
BUREAU OF LAND MANAGEMENT,
                    *Defendants,*

FIDELITY EXPLORATION AND
PRODUCTION COMPANY,
                    *Defendant-Intervenor,*

                    and

ANADARKO PETROLEUM
CORPORATION; DEVON ENERGY
CORPORATION; PINNACLE GAS
RESOURCES, INC.,
                    *Defendants-Intervenors-*
                    *Appellants.*

No. 05-35587

D.C. No.
CV-03-00069-RWA

OPINION

Appeal from the United States District Court
for the District of Montana
Richard W. Anderson, Magistrate Judge, Presiding

Argued and Submitted
September 15, 2005—Seattle, Washington

Filed September 11, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Arthur L. Alarcón and Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Chief Judge Schroeder

**COUNSEL**

Jack R. Tuholske, Tuholske Law Office, PC, Missoula, Montana, for appellants Northern Plains Resource Council.

John B. Arum (argued) and Brian C. Gruber (briefed), Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, and Joe A. Rodriguez (briefed), Law Offices of Joe A. Rodriguez, Lame Deer, Montana, for appellants Northern Cheyenne Tribe and Native Action, Inc.

John T. Stahr, U.S. Department of Justice, Environmental & Natural Resources, Washington, D.C., for the appellees.

John C. Martin, Patton Boggs LLP, Washington, D.C., for intervenors-appellees Pinnacle Gas Resources, Inc., Devon Energy Corporation, and Anadarko Petroleum Corporation.

Jon Metropoulos, Gough, Shanahan, Johnson & Waterman, Helena, Montana, for intervenor-appellee Fidelity Exploration & Production Company.

Jason S. Ritchie (briefed), Holland & Hart LLP, Billings, Montana, for amicus curiae Nance Petroleum Corporation.

Jay Jerde (briefed), Deputy Attorney General, Wyoming Attorney General's Office, Cheyenne, Wyoming, for amicus curiae State of Wyoming.

Nancy L. Rohde (briefed), Big Horn County Attorney's Office, Hardin, Montana, for amicus curiae Big Horn County, Montana.

## OPINION

KLEINFELD, Circuit Judge:

This appeal challenges an injunction limiting but not entirely prohibiting coal bed methane development while the Bureau of Land Management expands an environmental impact statement.[1]

## Facts

The Powder River Basin in Montana and Wyoming is the largest coal deposit in the United States and among the largest in the world. For over a century, it has been developed into ranches, farms, and coal mines. Farmers and ranchers generally have surface rights to the land involved in this case, but not hell-to-heaven rights. The federal government owns subsurface mineral rights to the land at issue.

Besides its value for grass to feed cattle, farms, and coal mines, the land is thought to cover vast amount of methane. This coal bed methane is a natural gas generated by coal deposits and trapped in coal seams by groundwater. Coal bed methane is extracted by pumping the groundwater out of the land and into rivers. As the water is removed, the hydraulic pressure on the gas is relieved, so the gas percolates and is piped to the surface, where it can be recompressed for ship-

---

[1]Environmental lawyers ordinarily use acronyms, and cite statutes by section numbers in the enactment rather than by section numbers in the United States Code. This opinion is written in ordinary English. Specialists might find this opinion more accessible if we explain that it concerns a NEPA challenge to a ROD of the BLM concluding that a FEIS adequately evaluated CBM development under the Powder River Resource Area RMP. The district court held the FEIS inadequate and partially enjoined approval of APDs until BLM completed a SEIS. We refer to statutory provisions by section numbers in the United States Code rather than section numbers in the original Act. *See Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1308 n.1 (9th Cir. 1992).

ping. The process poses three potential environmental problems: the aesthetic harm from visibility of wells, pipes, and compressors on the ranches and farms; the pollution of the rivers and streams into which the groundwater is pumped; and the lowering of the water table, so that ranchers' and farmers' (and expanding suburban developers') wells run dry unless they are drilled deeper.

The federal government owns most of the subsurface mineral rights in the Powder River Basin. The Bureau of Land Management administers mineral resources owned by the federal government. It leases these resources for development under the Mineral Leasing Act[2] and manages them according to resource management plans developed under the Federal Land Policy and Management Act.[3]

For more than twenty years, the Bureau of Land Management has had resource management plans for the Powder River Resource Area. In 1994, BLM prepared an environmental impact statement analyzing development of oil and gas resources. On the basis of this environmental impact statement, it amended the resource management plan to permit development of conventional oil and gas resources and limited exploration and development of coal bed methane resources. In 1997, BLM began selling leases to develop oil and gas resources and leaseholders began exploring coal bed methane resources. The Powder River Basin covers about 14 million acres. The resource area covers about 8 million acres. About 4 million acres are currently leased.

Exploration revealed extensive coal bed methane deposits. As natural gas grew scarcer and more expensive, and energy independence became an increasingly significant government priority, the coal bed methane attracted more governmental interest in development. In 2002, BLM, together with the

---

[2]30 U.S.C. § 221 *et seq.*
[3]43 U.S.C. § 1701 *et seq.*

Montana Board of Oil and Gas Conservation and the Montana Department of Environmental Quality, issued a draft environmental impact statement analyzing development of coal bed methane resources and made it available for public review and comment.

The draft environmental impact statement analyzed five alternatives in detail: (A) "No Action (Existing Management)"; (B) "Emphasize Soil, Water, Air, Vegetation, Wildlife, and Cultural Resources"; (C) "Emphasize CBM Development"; (D) "Encourage Exploration and Development While Maintaining Existing Land Uses"; (E) "Preferred Alternative" that would "facilitate CBM exploration and development while sustaining resource and social values, and existing land uses." The "Preferred Alternative" would not permit operators to drill more than one well per 640 acres without a project plan developed in consultation with the affected surface owners and permitting agencies.

This draft environmental impact statement was challenged by the federal Environmental Protection Agency, the Montana Department of Fish, Wildlife, and Parks, an advocacy group calling itself the Northern Plains Resource Council, and the Northern Cheyenne Tribe of Indians. The commenters suggested that BLM should study an additional alternative, which they called "phased development." The final environment impact statement responds to this suggestion partly by saying that many of the points at issue are addressed in the environmental impact statement. The primary response, though, is that "existing oil and gas leases" approved pursuant to a 1994 resource management plan included the rights to explore and develop coal bed methane, and the time for challenging the 1994 decision was passed.

The district court concluded that the final environmental impact statement was generally sufficient under NEPA, but improperly failed to consider the "phased development" alter-

native proposed by the commenters.   Accordingly, it partially enjoined coal bed methane development:

> Having considered the arguments, as well as the evidence and testimony presented, the Court finds that BLM's proposal presents a balanced, equitable approach to CBM development during the pendency of the SEIS. In making this finding, the Court bears in mind that, in its opinion on the merits, the EIS generally passed muster under NEPA, with the exception of the failure to consider a phased development alternative. The plan designed by BLM is tailored to address this deficiency by allowing a type of phased development to proceed at the same time BLM analyzes the efficacy of such an alternative. The proposal will assist BLM in choosing between alternatives by permitting the agency to study the effects of phased CBM development while preparing the SEIS.[4]

The injunction prohibited coal bed methane development on 93% of the resource area until BLM completed a revised environmental impact statement, but permitted development on 7% of the resource area, subject to site-specific review. The district court granted the partial injunction on BLM's recommended terms, concluding it was a "balanced and equitable" solution because "the EIS generally passed muster under NEPA, with the exception of the failure to consider a phased development alternative."[5] As the district court noted, the partial injunction allows "allowing a type of phased development to proceed at the same time BLM analyzes the efficacy of such an alternative."[6] In other words, the district court

---

[4]*N. Plains Res. Council v. United States BLM*, 2005 U.S. Dist. LEXIS 25238, 7-8 (D. Mont. 2005).

[5]*N. Plains Res. Council v. United States BLM*, 2005 U.S. Dist. LEXIS 25238, 7 (D. Mont. 2005).

[6]*N. Plains Res. Council v. United States BLM*, 2005 U.S. Dist. LEXIS 25238, 7 (D. Mont. 2005).

allowed what amounted to the "phased development" alternative to proceed while BLM decided whether to adopt it. The challengers got approximately the alternative they wanted BLM to consider, while it was being considered.

The district court found that the challengers failed to show coal bed methane would cause environmental degradation. The expert evidence they presented consisted of speculation on what harm coal bed methane development might cause and omitted relevant data like drought and stream flow volume. BLM studies showed that the environmental impact of coal bed methane development was less than anticipated, because it produced "much less" wastewater at a "slower rate" with "considerably lower" emissions than BLM's environmental impact statement predicted.[7] Also, BLM planned to adopt more stringent requirements for disposal of wastewater, preservation of ground water, and protection of tribal cultural resources while preparing the supplemental environmental impact statement. Moreover, "each site-specific plan for development will be subject to an independent NEPA analysis."[8] Even though the partial injunction permits coal bed methane development on 7% of the resource area, nothing can happen on the ground until BLM issues a drilling permit, which requires additional NEPA analysis.[9]

The district court rejected the developers' challenges on the other side, because they presented insufficient evidence the partial injunction would cause economic harm. Balancing the equities, the court allowed limited coal bed methane development under the BLM plan because "CBM is an efficient and clean-burning fossil fuel that produces fewer emissions than

---

[7]N. Plains Res. Council v. United States BLM, 2005 U.S. Dist. LEXIS 25238, 8 (D. Mont. 2005).

[8]N. Plains Res. Council v. United States BLM, 2005 U.S. Dist. LEXIS 25238, 9-10 (D. Mont. 2005).

[9]N. Plains Res. Council v. United States BLM, 2005 U.S. Dist. LEXIS 25238, 13-14 (D. Mont. 2005).

other fossil fuels" and "the public interest favors both developing CBM and protecting the environment."[10]

The advocacy group, the tribe, and the developers all appeal.[11] We stayed all coal bed methane development pending resolution of this appeal.[12]

## I.   Allowing some development.

The advocacy group and the tribe argue on appeal that the district court was obligated to enjoin all coal bed methane development, not just development on 93% of the resource area. They claim "NEPA requires that no development proceed until after a valid EIS is complete." They argue 40 C.F.R. § 1506.1(c)(3)[13] required the district court to enjoin all development because it concluded that the final environment impact statement mistakenly failed to consider the phased development alternative. The theory is that when a district

---

[10]*Northern Cheyenne v. Norton*, Cause No. CV 03-69-BLG-RWA (D. Mont. April 5, 2005).

[11]The developers have standing to challenge the terms of the injunction, but not to defend the adequacy of the environmental impact statement. "Since NEPA requires only action by the government, no private party can comply with NEPA. It is for that reason that in a lawsuit to compel compliance with NEPA, no one but the federal government can be a defendant." *Sierra Club v. United States EPA*, 995 F.2d 1478, 1485 (9th Cir. 1993). The developers' arguments are in the latter category, so we do not address them.

[12]We asked the parties whether BLM had completed the revised environmental impact statement post-appeal and rendered this case moot, but they advised us it had not.

[13]"While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action . . . Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives." 40 C.F.R. § 1506.1(c)(3).

court finds a violation of a statute, it must enforce the statute without qualification.[14]

[1] We are bound by precedent to hold that a NEPA violation is subject to traditional standards in equity for injunctive relief and does not require an automatic blanket injunction against all development. We review the scope of an injunction for abuse of discretion.[15] In *High Sierra Hikers Ass'n v. Blackwell*, we held that "the court must balance the equities between the parties and give due regard to the public interest."[16] And in *Idaho Watersheds Project v. Hahn* we held that the "interim measures imposed by the district court are a fair and balanced interim remedy, giving due regard to protection of the environment and the welfare of the affected ranching families."[17]

[2] Injunctive relief is appropriate when a party demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[18] Injunctive relief is typically appropriate in environmental cases (and was granted in this case) because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by

---

[14]Appellants cite *United States v. Oakland Cannabis Buyers' Coop*, 532 U.S. 483 (2001) and *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), for this general proposition, but do not cite any authority holding a NEPA violation requires an automatic, full injunction rather than a partial injunction.

[15]*United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005).

[16]*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004).

[17]*Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833-34 (9th Cir. 2002).

[18]*eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006).

money damages and is often permanent or at least of long duration, *i.e.*, irreparable."[19] But injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found. As the Supreme Court held in *Weinberger v. Romero-Barcelo*, "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."[20]

[3] When injunctive relief is appropriate, "the court must balance the equities between the parties and give due regard to the public interest."[21] Sometimes a full injunction is appropriate. But at other times, the equities demand a partial injunction.[22] "A district court has 'broad latitude in fashioning equitable relief when necessary to remedy an established wrong.' "[23]

[4] We cannot, on the basis of these cases, fault the district court's exercise of its discretion to issue a partial injunction balancing the equities rather than an automatic full injunction. In *eBay Inc. v. MercExchange, L.L.C.*, the Supreme Court held that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity."[24] And in *Amoco Prod.*

---

[19]*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)

[20]*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

[21]*Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833 (9th Cir. 2002) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

[22]*See*, *e.g.*, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) *and Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833-34 (9th Cir. 2002).

[23]*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (quoting *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 999 (9th Cir. 2000)).

[24]*eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1841 (2006).

*Co. v. Vill. of Gambell*, the Supreme Court held that "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[25] If the district court had issued an automatic injunction prohibiting all development without balancing the four equitable considerations, it would have violated *eBay* and *Amoco*.

[5] The partial injunction permits what appellants claim to seek: phased development rather than full-field development. The court found that the environmental impact statement basically complied with NEPA, except for its failure to consider phased development. The partial injunction fully remedies this failure. The district court concluded that a partial injunction would not cause irreparable harm, because a drilling permit cannot issue without site-specific environmental assessment. And it considered the public interest in clean energy development as well as prevention of environmental harms.

In *Weinberger v. Romero-Barcelo*, the Supreme Court held that permitting the Navy to continue discharging ordnance into the sea during the permit application process did not violate the Federal Water Pollution Control Act, because "the discharge of ordnance had not polluted the waters, and, although the District Court declined to enjoin the discharges, it neither ignored the statutory violation nor undercut the purpose and function of the permit system."[26] And in *Amoco Prod. Co. v. Vill. of Gambell*, the Supreme Court held that permitting oil exploration to continue pending administrative review did not violate the Alaska National Interest Lands Conservation Act because "injury to subsistence resources from exploration was not at all probable. And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $ 70 million to

---

[25] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)

[26] *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314-15 (1982).

exploration to be conducted during the summer of 1985 which they would have lost without chance of recovery had exploration been enjoined."[27]

**[6]** Importantly for this case, *Amoco* held that a presumption of irreparable harm "is contrary to traditional equitable principles" and "the environment can be fully protected without this presumption."[28] Likewise, in *High Sierra Hikers Ass'n v. Blackwell*, we held that a partial rather than a blanket injunction was proper, despite a NEPA violation, because it sufficiently took account of the potential harms on both sides.[29]

Here, the district court found the Bureau of Land Management took a "hard look" at the environmental consequences of coal bed methane development, and failed only to analyze a phased development alternative in addition to the five others. It found the evidence suggests coal bed methane development causes less environmental damage than BLM anticipated. And it found BLM's proposed limited injunction adopted measures calculated to minimize potential damage to the environment.[30]

---

[27]*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987)

[28]*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987)

[29]*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642-643 (9th Cir. 2004).

[30]The dissent argues a NEPA violation requires an injunction prohibiting all action pending NEPA compliance. On the contrary, there is no such absolute rule, and were we to impose one, it would run afoul of Supreme Court precedent and our own precedent. The Supreme Court and Ninth Circuit precedents clearly establish that courts must apply the usual equitable factors in determining the scope of an injunction pending NEPA compliance. In *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987) and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982), the Supreme Court held that courts must apply the usual equitable factors in determining the scope of an injunction pending compliance with procedural environmental laws. And in *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642-43 (9th Cir. 2004) and *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 834 (9th Cir. 2002), we held the district court prop-

## II.  Tribal claims.

Northern Cheyenne Tribe argues that the district court erred in dismissing its claim under the National Historic Preservation Act.[31] It argues the statute requires BLM to consult with the tribe before issuing leases, because some of the resource areas contain sites of great cultural importance to the tribe. The tribe also claims that the environmental impact statement was inadequate because it only superficially examined the sociological and cultural effect of coal bed methane development on the tribe. We review these claims *de novo*, because the district court granted summary judgment.[32]

[7] We need not reach the merits of the claim that the resource management plan will adversely affect Indian cultural resources. Neither the plan nor the partial injunction can affect any Indian cultural resources, because no actual devel-

---

erly considered the usual equitable factors and imposed "interim measures" amounting to a partial injunction pending NEPA compliance. We have repeatedly held district courts must consider the traditional equitable remedies in fashioning injunctive relief pending NEPA compliance. *See*, *e.g.*, *NRDC v. United States Forest Serv.*, 421 F.3d 797, 817 (9th Cir. 2005); *Westlands Water Dist. v. United States DOI*, 376 F.3d 853, 877 (9th Cir. 2004); *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 739 (9th Cir. 2001); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995). Whether we refer to the form of the relief ultimately ordered as a "partial injunction," a "limited injunction," or an "injunction" is immaterial.

The dissent argues 40 C.F.R. § 1506.1(c) prohibits all action pending NEPA compliance. The regulation does not say that. Instead, it imposes only what it terms "Limitations on actions during NEPA process," and 40 C.F.R. § 1506.1(c) expressly *allows* even "major Federal action" where criteria are satisfied. We held in *ONRC Action v. BLM*, 150 F.3d 1132, 1138 (9th Cir. 1998) that the NEPA limitation on actions "is not without qualification," citing this regulation, and holding that it applied to that case. Likewise, for the reasons explained above, it applies in this case.

[31]16 U.S.C. § 470 *et seq.*

[32]*Gros Ventre Tribe v. United States*, 469 F.3d 801, 808 (9th Cir. 2006).

opment is possible without additional environmental assessment, consultation with the tribe as required by the National Historic Preservation Act, and permits. The BLM decision supporting the resource management plan expressly states that it "is not the final approval of any specific oil and gas exploration, production, or development activities."

[8] BLM concedes that except where barred by limitations, the Tribe "is free to bring an action challenging any site-specific leasing decision" issued under the resource management plans. And it concedes that a "site specific analysis, including a cumulative impact analysis, will be done when a lessee comes to the BLM with a plan of development and associated [applications for a permit to drill]."[33] The final environmental impact statement provides that "site specific impacts on cultural resources will be analyzed as part of the NEPA document prepared for each oil and gas action as required in the lease notice." The Northern Cheyenne Tribe will be (and has been) consulted. With these concessions, the tribal concerns are unripe. "Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."[34]

## V.   Conclusion

The district court did not abuse its discretion in issuing the partial injunction proposed by BLM because it provides an equitable resolution consistent with the purposes of NEPA.

AFFIRMED.

---

[33]"APDs," in agency jargon.

[34]*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990)

SCHROEDER, Chief Judge, dissenting:

We all agree that the district court correctly held that the Bureau of Land Management violated NEPA when it drafted an environmental impact statement considering several alternatives for large scale exploration and development of coal bed methane mining in the Powder River Basin, but did not consider an alternative that would have phased exploration and development on a more gradual basis. We also agree that the district court correctly ordered the agency to comply with NEPA by preparing a supplemental environmental impact statement that studied this "phased development" alternative.

Instead of entering an injunction to preserve the status quo pending the agency's compliance with NEPA, however, the District Court entered an injunctive order that put into effect the very alternative the BLM had failed to study. It is here that I part company with the majority's affirmance, because the district court's order allows major new activity to be introduced into the area, potentially involving mining, road construction, and water usage affecting precious underground aquifers, before NEPA has been satisfied. Allowing this activity to take place before completion of the EIS is contrary to the core purpose of NEPA, which is to ensure consideration of all alternatives before major government action is taken. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (stressing NEPA's mandate that "an EIS be prepared for all major Federal actions significantly affecting the quality of the human environment"); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 831 (9th Cir. 2002) (agency required to "conduct environment studies required by law [to] properly determine . . . what measures should be implemented permanently"); *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002) (approving injunction where agency "failed to consider important aspects of the problem before" it); *Davis v. Mineta*, 302 F.3d 1104, 1110 (10th Cir. 2002) (requiring injunction pending determination of project's "potential effects on the environment, parkland

and historic structures"). We have never allowed new federal action to take place before the agency has complied with NEPA. Yet the majority affirms the district court's order doing precisely that.

The result here is also contrary to fundamental injunction principles, which stress avoiding undue hardship and maintaining the status quo pending completion of agency or other legal proceedings. Indeed, a motions panel of this court entered an order granting an emergency motion to enjoin all projects, drilling and new construction pending resolution of this appeal. We have repeatedly emphasized the importance of maintaining the status quo pending compliance with NEPA. *Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*, 479 F.3d 1148, 1151 (9th Cir. 2007) ("the whole point of the injunction" is to maintain the status quo pending evaluation). Ironically, the cases on which the majority relies make exactly this point. *See High Sierra Hikers Ass'n*, 390 F.3d 630; *Idaho Watersheds Project*, 307 F.3d 815. They both affirmed injunctive orders that permitted, on a limited basis, activities that were already taking place, but enjoined any new activity pending study. In *High Sierra Hikers Ass'n*, we enjoined issuance of new commercial packstock special-use permits, while allowing packstock operators to continue to use the special-use permits that already had been issued. 390 F.3d at 642-42. In *Idaho Watersheds Project*, we enjoined issuance of new grazing permits that had not been lawfully authorized prior to the proposed changes in the regulation at issue in that case. 307 F.3d at 827.

The majority says in note 30 that courts are required to "apply the usual equitable factors" in determining the scope of injunctive relief, suggesting that advocates seek a different test. Of course we do not abandon the usual standard for determining whether injunctive relief is warranted when we decide an environmental case. We are, however, bound by NEPA, and allowing the agency to take new action without

adequate environmental study creates a serious threat of irreparable harm under NEPA.

The whole point of NEPA is to study the impact of an action on the environment before the action is taken. *See Conner v. Buford*, 848 F.2d 1441, 1532 (9th Cir. 1988) (NEPA requires that agencies prepare an EIS before there is "any irreversible and irretrievable commitment of resources"). Where "[i]nterim action prejudices the ultimate decision on the program[,]" NEPA forbids it. 40 C.F.R. § 1506.1(c)(1)-(3). Action prejudices the outcome "when it tends to determine subsequent development or limit alternatives." *Id.* In this case, once coal bed methane development is allowed, the impact on the environment cannot be undone, which is exactly the situation NEPA disallows—allowing new activity that limits alternatives in the future.

The majority speaks in terms of "blanket" and "partial" and "limited" injunctions, but such terminology is not used in environmental injunction cases. Our cases require that all available options be preserved, pending full environmental review. *See Se. Alaska Conservation Council*, 479 F.3d at 1151; *see also California v. Block*, 690 F.2d 753, 763 (9th Cir. 1982) ("the promise of site-specific EIS's in the future is meaningless if later analysis cannot consider wilderness preservation as an alternative to development"). We have never spoken of "limited" or "partial" injunctions in the NEPA context. Use of this new and confusing terminology puts this case even more out of synch with the law.

I understand the desire of the district court to try to find a middle ground, but with respect to NEPA's requirements for full study of alternatives prior to implementation of new, major federal action, there is no alternative. There must be compliance. I therefore respectfully dissent.