**UNDERWOOD LIVESTOCK,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 05–0162L.**

United States Court of Federal Claims.

Oct. 7, 2009.

Martin G. Crowley, American Legal Services, Fallon, NV, for Plaintiff.

E. Barrett Atwood, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendant. James Karkut, United States Department of the Interior, Salt Lake City, Utah, Of Counsel.

## OPINION GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION AND ENTERING SUMMARY JUDGMENT FOR DEFENDANT

WILLIAMS, Judge.

In this Fifth Amendment takings case, Plaintiff Underwood Livestock, Inc. ("Underwood") alleges that the Bureau of Land Management ("BLM") obstructed Underwood's use of its water rights by removing a water diversion structure in a creek flowing within Underwood Canyon in Nevada, and by fencing and barricading the surrounding area. The Interior Board of Land Appeals ("IBLA") concluded that there was no right-of-way authorizing the construction or maintenance of the diversion structure on federal land and found that the builders of the structure—Underwood's predecessors-in-interest—had trespassed. In a previous opinion, this Court denied the parties' cross-motions for summary judgment and noted that the IBLA decision, unless overturned by a court of competent jurisdiction, precluded Plaintiff from demonstrating that it had a cognizable property interest in the alleged right-of-way, thus defeating its takings claim. This Court stayed the case to allow Plaintiff to appeal the IBLA decision to the appropriate district court, which possessed exclusive jurisdiction for such review under the Administrative Procedure Act ("APA").[1] Although the District Court of Nevada did not overturn the IBLA decision, Plaintiff has returned to this Court seeking reconsideration of this Court's denial of summary judgment, and the Government cross-moved for reconsideration and entry of summary judgment. Because it is now clear that the IBLA decision remains in full force and effect, the Court grants the Government's motion for reconsideration and enters summary judgment for Defendant, holding that Plaintiff cannot relitigate the issue of ownership of the alleged right-of-way under principles of collateral estoppel.

### Background [2]

Plaintiff is a Nevada Corporation formed on December 29, 1989. Dalton Wilson is

---

1. Although Plaintiff's predecessors-in-interest, Wilson and Bowman, had filed a previous action in District Court seeking, *inter alia*, to quiet title to the right-of-way, it was not clear whether they had lodged an APA claim challenging the IBLA decision in that suit. Wilson and Bowman brought that action while their appeal at the IBLA was still pending. Although the IBLA issued its decision while the District Court action was pending, it is not clear whether Wilson and Bowman had then asked the District Court to overturn the IBLA decision. Following this Court's denial of summary judgment, Wilson and Bowman filed a second District Court action expressly seeking to overturn the IBLA decision. There, the District Court explained that it had entertained and dismissed Wilson and Bowman's APA challenge to the IBLA decision in their first suit. The District Court further found that Wilson and Bowman's claim under the Quiet Title Act precluded their APA claim because the Quiet Title Act claim covered the same factual allegations and was their exclusive remedy. The District Court thus dismissed Wilson and Bowman's subsequent challenge to the IBLA decision as res judicata. *See infra* notes 8–9 and accompanying text.

2. The factual background is set forth in the Court's earlier opinion. *Underwood Livestock, Inc. v. United States*, 79 Fed.Cl. 486 (2007). The Court here summarizes the salient undisputed

Underwood's owner, president, sole share-holder, and sole employee. Wilson is not a party to this litigation in his personal capacity.

### The "Brackney Water Diversion Structure" and 1924 Land Patent

In 1917, Thomas Brackney filed an application with the Nevada State Engineer for a permit to appropriate water from Underwood Canyon for irrigation and domestic purposes. Def.'s Mot. for Summ. J. Ex. G at 2, 3. The application indicated that water would be diverted at a point described as "Underwood Canyon S.W. 1/4 of N.E. 1/4 of Sec. 12, T. 22 N., R 47 E., M.D.B. & M." *Id.* Ex G at 3. The Nevada State Engineer approved the application on February 25, 1919, and granted Brackney a permit to appropriate water known as "Permit 4613." *Id.* Ex. G at 3–4. In 1919, Brackney built a water diversion structure consisting of a dam and a ditch. *Id.* Ex. H. Subsequently, in or about the 1920s, Brackney installed a pipeline in part of the ditch and erected a spring box in connection with this improvement. *Id.* Ex. I; *Wilson and Bowman,* 156 IBLA 89, 97 n. 11 (2001).

On June 17, 1930, the State Engineer issued a Certificate of Appropriation of Water (Certificate 1656) to Brackney, which indicated that the appropriation of water related to Permit 4613 was a vested water right. Specifically, the Certificate afforded Brackney and his successors-in-interest the right to divert 0.323 cubic feet per second ("cfs") of surface waters of the Canyon during the period from April 1 to October 1 of each year from a diversion point defined as NW 1/4 NE 1/4 sec. 7 T. 22 N.; R. 48 E., Mount Diablo Meridian, Lander County, Nevada. Def.'s Mot. for Summ. J. Ex. G at 2.

facts supporting its entry of summary judgment. This background is derived from Plaintiff's Amended Complaint as well as attachments to the parties' motions for summary judgment, including the IBLA decision, *Dalton Wilson, Don Bowman,* 156 IBLA 89 (2001), and excerpts from the record in two district court actions, *Bowman and Wilson v. Babbitt,* 00–cv–506–HDM (D. Nev. *dismissed* Aug. 29, 2003) and *Wilson and Bowman v. U.S. Dep't of Interior,* 07–cv–612–HDM–RAM (D. Nev. *dismissed* Oct. 30, 2008).

Meanwhile, on February 19, 1924, the United States issued a patent to Brackney under the Act of Congress of May 20, 1862, Ch. 75 § 1, 12 Stat. 392, for 80 acres of land described as the "south half of the northwest quarter of Section twelve in Township twenty-two north of Range forty-seven east of the Mount Diablo Meridian, Nevada, containing eighty acres." Def.'s Mot. for Summ. J. Ex. J. The patent provided in pertinent part:
> NOW KNOW YE, That there is, therefore, granted by the United States unto the said claimant the tract of Land, ... with the appurtenances thereof, unto the said claimant and to the heirs and assigns of the said claimant forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts; *and there is reserved from the lands hereby granted a right of way thereon for ditches or canals constructed by the authority of the United States.*

156 IBLA at 95, Def.'s Mot. for Summ. J. Ex. J (emphasis added).

### Wilson's Purchase of the Land and Subsequent Chain of Title

In 1980, Dalton Wilson purchased the same 80 acres of land, with an appurtenant Nevada water right, Certificate 1656. Pl.'s Mot. for Summ. J. Ex. A, (Declaration of Dalton Wilson, Sept. 26, 2002 ("Wilson Decl.") ¶¶ 2, 6). Over the next few years, the property changed hands several times. In 1994, Don Bowman purchased the property and leased it to Underwood the same year. Am. Compl. ¶ 7; *see also* Pl.'s Supp., Declaration of Don Bowman ("Bowman Decl.") ¶¶ 1–2, (Sept. 20, 2006).[3]

3. Plaintiff submitted for the record a notarized deed of transfer of water rights, including the Certificate 1656 water rights from Wilson as Grantor to Underwood Livestock, Inc. as Grantee, dated February 1, 1990. Pl.'s Sept. 23, 2006 Supp. Br. Ex. E. However, according to Wilson's declaration and the Amended Complaint, Western Farm Credit, not Wilson, owned both the property and water rights between 1989 and 1994. Am. Compl. ¶ 7; Wilson Decl. ¶ 22–23. The Amended Complaint makes no mention of this 1990 transfer or deed.

On May 23, 1994, Bowman signed a two-year agreement, agreeing to lease these land and water rights to Wilson for $1,200 a month, giving Wilson an option to purchase the land and water rights. Def.'s Mot. for Summ. J. Ex. K. The lease included the water rights pertaining to Permit No. 4613 and Water Certificate 1656. *Id.* Ex. K at 2. Underwood was not mentioned in the lease.

The lease was set to expire on May 20, 1996, but Wilson asserts that he and Bowman orally agreed to extend the lease agreement and that Underwood subsequently exercised the option to purchase the property on April 4, 2002.[4] *Id.* Ex. A (Wilson Dep. at 40–41, Feb. 27, 2002), Ex. D at 8, Ex. L (Bowman Dep. at 23–24, Feb. 26, 2002). There was no mention of any transfer of water rights in the grant, bargain and sale deed governing Underwood's purchase of the property. Pl.'s Mot. for Summ. J. Ex. C at 14–15. Underwood subsequently lost the property by defaulting on its mortgage in June 2005. Def.'s Mot. for Summ. J. Ex. M. The IBLA decision concluded that in 2000, at the time of the alleged taking, Bowman owned the water rights, citing Certificate 1656. 156 IBLA at 91 n. 4.

### The Wilson Water Diversion Structure and BLM Trespass Proceedings

By 1998, all that remained of the original Brackney Water Diversion Structure were "scraps of old wood, which might be remnants of the spring box" and a pipeline that appears to have "been abandoned for at least 10 years ... [with] small aspen trees growing through the metal." 156 IBLA at 98 n. 12 (2001) (internal quotations and citations omitted).

In approximately 1998, Wilson constructed a new water diversion structure in the vicinity of the Brackney water diversion structure which consisted of 19 heavy equipment tires. Wilson built this dam by taking "an old military four-by-four" to haul three tires at a time and then "took a 933[CAT] loader, crawler loader in there with a front-end bucket on it and back grippers on it ... [and] installed the dam, just within 20 feet

below the original [Brackney] structure ... [downstream]." Def.'s Mot. for Summ. J. Ex. A (Wilson Dep. at 80, Feb. 27, 2002). The tire dam was approximately 69 feet in length and crossed the creek that flows down the Underwood Canyon, virtually impounding the water. 156 IBLA at 90. Wilson asserts that he did not seek or obtain authorization from the BLM to build the tire dam because "none was needed," because he had a pre-existing right-of-way under the 1866 Act. *Id.* at 95.

On March 8, 2000, BLM issued a Notice of Trespass/Notice to Cease and Desist to Wilson and Bowman advising them that trespass proceedings had been initiated against them due to the construction of the tire structure on public lands. *Id.* at 91. Specifically, BLM stated that because neither Bowman nor Wilson had received authorization for the construction and maintenance of the new dam, both Wilson and Bowman were deemed to have trespassed on federal land in violation of the Federal Land Policy and Management Act, as amended, 43 U.S.C. §§ 1701–85 (1994) ("FLPMA") as implemented by 43 C.F.R. § 2801.3. *Id.*

On April 10, 2000, BLM issued a decision finding that the construction of Wilson's tire dam constituted a trespass on public land, requiring Wilson and Bowman to pay trespass damages in the amount of $6,722.16 and to cease the trespass. *Id.* at 92. Subsequently, BLM removed the dam and sent a letter to Wilson dated January 6, 2006, demanding payment in the amount of $20,349.82 for the removal and $828.66 for site rehabilitation. Def.'s Resp. to Pl.'s Mot. for Summ. J. Ex. S.

### Appeal to the Interior Board of Land Appeals

Wilson and Bowman each separately appealed BLM's decision to the IBLA, arguing that they were not required to obtain authorization from BLM to construct the tire dam because they owned private land, appurtenant water rights, and an easement or right-of-way arising under state law. 156 IBLA at

---

4. It is unclear from the record why Underwood rather than the named lessee, Dalton Wilson, exercised the option to purchase.

93. They argued that these property rights were acquired and perfected prior to the enactment of the FLPMA and were protected by that statute, such that they were not required to obtain any authorization to erect the tire dam under that statute or its implementing regulations. *Id.*[5] Finally, they claimed that requiring such authorization constituted an ultra vires act on the part of BLM and/or a condemnation of their property rights without just compensation in violation of the Fifth Amendment. *Id.*

The IBLA consolidated their appeals and, in a decision dated December 14, 2001, rejected their arguments. The IBLA found that Bowman owned the water right at issue here stating:

> It is also undisputed that Bowman acquired water rights from the [Western Farm Credit Bank] that are appurtenant to part of his private lands in the S 1/2 NW 1/4 sec. 12 (as well as part of the public lands in the NE 1/4 SW 1/4 sec. 12), which are recognized ... under State law.... Bowman applied to the State on January 17, 1995, to transfer these water rights to Wilson and/or [Underwood], but, at all relevant times herein, the transfer had not yet been approved.

156 IBLA at 91 (citing Certificate 1656). As holder of the water right, Bowman alleged before the IBLA that his water right provided him "a right to construct and maintain a water diversion structure on public lands, arguing that such construction/maintenance is permitted 'within existing rights-of-ways granted by state laws, local customs and by the original patent or the land.'" *Id.* at 92 (quoting Letter from Bowman to BLM, dated Mar. 27, 2000). Wilson adopted this same argument before the IBLA. *See id.* at 93. The IBLA rejected the argument that Bowman and Wilson had a right to use federal lands simply because they possessed an interest in a water right under Nevada law. The IBLA stated:

Underlying appellants' appeals from BLM's April 2000 Trespass Decision is a fundamental misconception regarding the nature and extent of their water rights under State law, which concern only the proper use and dispensation of the water to which they are entitled. Such rights do not include any automatic right to use Federally-owned lands for the construction and maintenance of a structure, even where it is utilized in connection with those water rights.

*Id.* at 94 (citations omitted). The IBLA continued:

> Although appellants' State water rights ... were protected by section 701 of FLPMA, Pub.L. No. 94–579, 90 Stat. 2786 (1976), such rights do not control the use and dispensation of Federally-owned lands.

*Id.* at 95 (citing *Wayne D. Klump*, 130 IBLA at 101).

Next, the IBLA noted that "[a]lthough appellants refer to an existing 'easement' and 'right-of-way' that assertedly entitle them to place the structure on public lands, they present no evidence on appeal of the existence of such an easement or right-of-way deriving either from State or Federal law." 156 IBLA at 95. The IBLA held that "any person who desires, on or after Oct. 21, 1976, to use, occupy, or develop the public lands for the purposes of impounding, storing, transporting, or distributing water [was] required to obtain a right-of-way or other authorization pursuant to Title V of FLPMA and its implementing regulations." *Id.* at 97 n. 10 (citing 43 U.S.C. §§ 1761(a), 1770 (1994); 43 C.F.R. § 2800.0–7 and *Wayne D. Klump*, 130 IBLA 98, 101 (1994)). The IBLA expressly recognized that neither Wilson nor Bowman had proved the existence of a right-of-way, stating:

> At various times between October 5, 1998, and January 27, 2000, BLM discussed with Wilson and/or Bowman whether to grant a right-of-way pursuant to Title V of FLPMA ... that would authorize some

---

**5.** FLPMA authorizes the Secretary of the Interior to "grant, issue, or renew rights-of-way over, upon, under, or through [public lands] for," among other purposes, "reservoirs, canals, ditches, flumes, laterals, pipes, pipelines, tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water." 43 U.S.C. § 1761(a)(1). Effective October 21, 1976, no right-of-way could be granted, issued, or renewed except in accordance with the relevant provisions of FLPMA concerning rights-of-ways on public lands. 43 U.S.C. § 1770.

manner of impoundment of the surface waters of the creek in Underwood Canyon and their conveyance to the appurtenant private lands owned by Bowman in the S 1/2 NW 1/4 sec. 12. Despite repeated written requests by BLM starting in August 1999, no right-of-way application was ever submitted by Wilson or Bowman.

156 IBLA at 91 (footnote omitted).

The IBLA also determined that the Brackney patent's reservation for ditches or canals did not authorize the tire dam. *Id.* at 95–96. The IBLA found that the only way in which such a right to construct the tire dam could have existed appurtenant to the 1924 Brackney patent would have been as a right-of-way under section 9 of the Act of July 26, 1866, known as a R.S. 2339 right-of-way. *Id.* at 96.[6] Section 9 of the 1866 Act provided that those who held vested water rights also held a separate and independent right-of-way for the construction of ditches and canals. This right-of-way was interpreted to include dams, reservoirs, pipes, and other structures. 156 IBLA at 97 (citing *Broder v. Natoma Water Company,* 101 U.S. 274, 275, 25 L.Ed. 790 (1879); *Utah Light & Traction Co. v. United States,* 230 F. 343, 345–46 (8th Cir.1915); *Martin Hackworth,* 141 IBLA 249, 251–52 (1997)). Thus, the IBLA found that under the 1866 Act, holders of valid water rights under state law could obtain a right-of-way by constructing improvements on federal lands without obtaining authorization or approval from the Federal Government. 156 IBLA at 97.

However, the IBLA identified two impediments to Dalton and Wilson attaining the right-of-way under this statute. First, this provision was repealed in 1976. After October 21, 1976, the effective date of FLPMA's repeal of the relevant portion of the 1866 Act, an owner of a valid water right could no longer obtain a right-of-way on federal lands simply by constructing improvements, including ditches, canals, and dams on federal lands. Instead, the water-right owner was required to apply to the BLM for a right-of-way or some other form of authorization. 156 IBLA at 97 (citing 43 U.S.C. §§ 1761(a)(1), 1770). Second, a pre-existing right-of-way, which pre-dated the 1976 FLPMA legislation, must have remained in use in order to remain valid. Here, the alleged right-of-way did not remain in use. The IBLA expressly found as fact that the pre-existing Brackney water impoundment structure did not remain in use and thus held that the validity of the pre-existing right-of-way was not extended. 156 IBLA at 97.[7]

The IBLA further held that any pre-existing 1866 Act right-of-way was extinguished because "the right-of-way was co-extensive with the [Brackney] constructed structures." *Id.* at 98. The IBLA made this determination because "any structure that might have been erected in connection with an R.S. 2339 right-of-way prior to October 21, 1976, had seemingly fallen into such a state of disrepair that the right-of-way had ceased to exist." *Id.* The IBLA explained:

> Although a water right itself may be deemed to have persisted under State law despite the cessation of water use even for many years, we find no indication that Congress intended that an R.S. 2339 right-of-way similarly persist[s] when it has ceased to be employed for any useful purpose. In any event, we do not think that such a right-of-way survived repeal by FLPMA of the originating statutory language, where there was no useful structure in existence on October 21, 1976, that might have served to support a valid existing right preserved by FLPMA.

*Id.* The IBLA thus affirmed the decision of the BLM, stating, "[w]e conclude that BLM properly determined in its April 2000 Trespass Decision under 43 CFR 2801.3, that the

---

6. The Act of July 26, 1866 is also known as the Mining Act of 1866, Ch. 262, § 9, 14 Stat. 253 *codified at* 43 U.S.C. § 661, *repealed in part by* the Federal Land Policy and Management Act, § 706(a), Pub.L. 94–579, 90 Stat. 2793 (1976). R.S. 2339 refers to the Revised Statute section in which this provision was once codified.

7. In addition, the IBLA found that it did not appear that Wilson and Bowman's predecessors-in-interest had ever had a R.S. 2339 right-of-way that would have entitled them to maintain a water diversion structure of the size and effectiveness of the tire dam because the only structures erected incident to their predecessors-in-interest's water rights were a spring box and pipeline. 156 IBLA at 97.

water diversion structure at issue here was constructed and is being maintained in trespass on the public lands." *Id.* at 98–99.[8]

### This Court's Previous Opinion

In the instant case, Plaintiff alleged that the actions of the BLM in dismantling the water diversion structure and creating a barricade preventing Plaintiff's access to the site constituted a taking of real and personal property without just compensation in violation of the Fifth Amendment.[9] Each party sought summary judgment.

In an opinion issued on November 29, 2007, the Court denied the parties' cross-motions for summary judgment and stayed the case in order to allow Plaintiff or its predecessors-in-interest to appeal the IBLA decision to the United States District Court for the District of Nevada. *Underwood Livestock, Inc. v. United States,* 79 Fed.Cl. 486, 500 (2007). The Court explained that, under the IBLA decision, Plaintiff could not establish that it had "a cognizable property interest in the right-of-way which entitled it or its alleged predecessors-in-interest to erect and maintain the dam on public lands." *Id.* at 497. Rather, "the IBLA expressly ruled that no such right-of-way existed and

that Plaintiff's president and sole shareholder was liable in trespass." *Id.* This Court elaborated:

Here, there is no question that the IBLA adjudicated the existence vel non of Wilson and Bowman's property interest which is coextensive with Underwood's claimed property interest in the tire dam and right-of-way. As such, this Court is not free to reexamine that issue.

*Id.* at 497–98. This Court reasoned that although Plaintiff did not expressly ask this Court to review the IBLA decision, Plaintiff did ask the Court to come to a conclusion "in direct conflict with the IBLA's holding that no right-of-way permitted construction of a tire dam on federal land." *Id.* at 497. Further, this Court found that it lacked jurisdiction to review the IBLA decision, because, under the APA, such jurisdiction rested exclusively with the District Court. *Id.* at 497–99.

In staying the case pending resolution of any APA challenge, this Court stated:

[T]he IBLA determined that even though Wilson and/or Bowman owned or leased the property and appurtenant water rights, there was no right-of-way authoriz-

---

8. While the appeals at the IBLA were pending, but before a decision was rendered, Wilson and Bowman filed suit in the United States District Court for the District of Nevada on September 29, 2000, against the Secretary of the Interior and BLM, alleging, *inter alia*, causes of action under the 1866 Act, the FLPMA, the Quiet Title Act ("QTA"), and the Fifth and Fourteenth Amendments to the U.S. Constitution. Complaint, *Bowman and Wilson v. Babbitt,* 00–cv–506–HDM (D.Nev. Sept. 29, 2000) ("*Bowman and Wilson I* "), Def.'s Mot. for Summ. J. Ex. N. In the District Court action, Wilson and Bowman sought to quiet title to their "easement on public lands sufficient to serve the water rights set forth in Certificate 1656 in favor of [Wilson and Bowman] pursuant to the Quiet Title Act, [the 1866 Act] and the savings clause in FLPMA." *Id.* ¶ 17. They also sought to enjoin defendants from enforcing BLM's trespass decision and from imposing any conditions on their rights to access their easement or interfering with their use of their diversion dam. *Id.* ¶ 18. The Government counterclaimed against Bowman and Wilson for trespass, and filed a motion for summary judgment arguing that the District Court lacked jurisdiction to hear any claim other than the Quiet Title Act claim. Def.'s Mot. for Summ. J. at 16. The Government argued that the APA does not confer

authority to grant relief if there is "other adequate remedy in a court," citing the Quiet Title Act as such remedy. *Id.*

The District Court found that the plaintiffs conceded that the District Court lacked jurisdiction over the APA claims. Tr. at 18, Jan. 15, 2003; *see also* Def.'s Status Report, May 17, 2007. The District Court granted summary judgment in the Government's favor on all claims except Wilson's QTA claim and the United States' counterclaim for trespass and scheduled the matter for trial. Tr. at 20–25. However, the Government subsequently discovered that Bowman did not transfer the real property at issue to Dalton Wilson, but instead had transferred his interest to Underwood—which was not a party in the District Court proceeding—prompting the District Court to dismiss Wilson's Quiet Title Act claim on August 29, 2003. *Bowman and Wilson I,* 00–cv–506 (Order Aug. 29, 2003). The District Court also dismissed Defendant's trespass counterclaims without prejudice. Wilson and Bowman did not appeal the District Court decision, and the record does not suggest that Underwood filed its own quiet title action.

9. Plaintiff's amended complaint in this action did not reference the IBLA decision or purport to seek review of that decision.

ing them to construct the tire dam on federal land, and they were trespassers. As such, BLM was fully authorized to dismantle the tire dam and assess trespass damages. *If this IBLA determination is upheld by the District Court, there can be no taking here.*

*Id.* at 497 n. 20 (internal citation omitted) (emphasis added). This Court further explained that the fact that Wilson, not Underwood, appealed the BLM decision to the IBLA did not alter the finality of the adjudication of the property right:

Underwood itself was not a party in the IBLA proceeding, although its president and sole owner Dalton Wilson was. However, the fact that Wilson, not Underwood appealed the BLM decision to the IBLA, does not alter the finality of the adjudication of the property right-which is akin to an *in rem* disposition, holding that no such property right to construct or maintain the tire dam existed because there was no right-of-way. The IBLA found that the alleged 1866 Act right-of-way permitting construction and maintenance of the tire dam did not exist because Certificate 1656 water rights only encompassed a spring box and a pipeline and did not entitle the owner to maintain a diversion structure in the size or location of the tire dam that Wilson erected and Underwood claims to own.... This finding that there was no such right-of-way is conclusive, no matter who was the successor-in-interest to the Certificate 1656 water right.

*Id.* at 498–99.

### Subsequent District Court Action

On December 14, 2007, following this Court's entry of a stay order, Wilson and Bowman sought judicial review of the IBLA decision under the APA in the United States District Court for the District of Nevada. *Wilson and Bowman v. U.S. Dep't of Interior,* No. 07–cv–612 (D.Nev.2007) ("*Wilson and Bowman II* "). Wilson and Bowman sought a declaratory judgment that the IBLA decision was void. Further, they asked the District Court to declare that "the certificated water right held by Plaintiffs as predecessors in interest to Underwood Livestock, Inc. holds with it the right to collect said water

through appropriate means." and that Underwood lawfully exercised its water rights pursuant to a valid lease. *Wilson and Bowman II,* Compl. at 4–5. Wilson and Bowman also requested a writ of mandamus directed to the BLM preventing it from interfering with their water rights. *Id.* at 7. The Government filed a motion to dismiss, arguing that Wilson and Bowman lacked standing because Underwood, not Wilson or Bowman, owned the water rights and alleged right-of-way. The Government also argued that Wilson and Bowman's claims were precluded by the District Court's earlier decision in *Wilson and Bowman I.*

On October 30, 2008, during a hearing on the Government's motion to dismiss, the District Court issued an oral ruling granting the Government's motion and dismissing Wilson and Bowman's claims. The Court dismissed the plaintiffs' requests for declaratory relief and mandamus for lack of standing. *Wilson and Bowman II,* Tr. at 15 (Oct. 30, 2008). The District Court stated: "Defendants have asserted, and I think with validity, the plaintiffs lack standing to assert [the foregoing claims] for relief because [these claims] involve determinations of the scope of the Brackney water right, the interest in which ... as I understand it ... is held by Underwood and not by either [Wilson or Bowman]." *Id.* at 5. The District Court dismissed the plaintiffs' request for a declaratory judgment and their request for judicial review of the IBLA decision as barred by res judicata, because the plaintiffs already attempted unsuccessfully to attack the BLM and IBLA decisions in the prior District Court action to quiet title. *Id.* at 8–11, 15. The District Court stated: "it is clear that substantially all ... [of] plaintiff's claims in this action arise from the same transactional nucleus of facts present in [*Wilson and Bowman I* ]," in which the District Court granted summary judgment for the Government. *Id.* at 8–9. The Court explained that "the first litigation involved Wilson's construction of a water diversion structure across public land and BLM's trespass decision.... The present litigation involves these same events ... and a number

of other issues that are properly characterized as quieting title." *Id.* at 9.

The District Court elaborated:

At the time the plaintiffs filed their first claim, as the Court has indicated, there was no final IBLA decision. Therefore, the plaintiffs assert that the Court could not have made a ruling on the decision. This argument is not factually correct.

The IBLA decision was final by the time this Court ruled on summary judgment. The IBLA decision had been raised and cited in defendants' motion for summary judgment. The plaintiffs had the opportunity, full opportunity to object and provide opposition to the motion for summary judgment on the APA claim.

The plaintiffs' argument I guess can be read to assert here that the Court lacks subject matter jurisdiction over the APA claim because it was not final at the time the complaint was filed. That argument in the opinion of the Court is not a valid argument.

The fact that an agency decision is not final under the APA is not a defect with respect to subject matter jurisdiction. The Ninth Circuit has so held in *Idaho Watersheds Project v. Hahn,* 307 F.3d 815 at 830 (9th Cir.2002).

Plaintiffs also argue that the APA claim was dismissed for failure to exhaust administrative remedies which, if true, would mean there was no final judgment on the merits of the claim. This argument is not supported by the record. There's no mention in the record that I could find that the APA claim was under attack because the plaintiffs failed to exhaust administrative remedies, rather the attack was a jurisdictional one; that the APA claim could not be asserted because the quiet title action provided exclusive remedy.

Under the APA the United States waives its sovereign immunity when a person has suffered some legal wrong as a result of an agency decision except where some other statute controls. And the QTA is such other statute, the quiet title action. Accordingly, the government's original argument was correct.

The problem is that the IBLA decision decided not only that the plaintiffs did not have a right-of-way across the public lands, it also upheld the trespass decision. From the case law, it appears that the APA allows an appeal from the IBLA regarding trespass decisions; however, the time to raise that objection and any such objection and all others was in the first action, the first litigation which was filed here, and in that [case] it was conceded that the Court lacks jurisdiction over the APA claim.

Plaintiffs fail to make any arguments in that action that they could have made such as, one, the trespass decision involved more than quieting title and therefore subject to review; or, two, the Court did not have jurisdiction over the APA claim because of failure to exhaust administrative remedies, or that the APA lacked jurisdiction to consider the matter because improper parties were before the administrative bodies. And the plaintiffs did not appeal the Court's judgment granting summary judgment expressly and precisely on the APA claim.

. . . .

The third claim, which is the APA claim, must be dismissed under the doctrine of res judicata for the reasons that I have previously articulated.

The IBLA decision, while not final at the time the complaint was filed, it was, in fact, final prior to the time that summary judgment was issued by the Court, granted by the Court, and prior to the time that the motion for summary judgment was filed. Parties were aware of it, it was raised before the Court, and judgment upon the merits was entered in connection with the APA claim at the time the judgment was entered . . . in the first proceeding.

*Id.* at 12–15.

### Present Motions

On February 2, 2009, this Court lifted the stay in this action and authorized the parties to file appropriate motions in light of the Nevada District Court's dismissal of Wilson and Bowman's second action. On April 6, 2009, Underwood filed a Motion for Clarification and/or Motion for Reconsideration of

this Court's Opinion of November 27, 2007. In its motion, Underwood raised new arguments. First, Plaintiff claimed that the IBLA's decision is void because the IBLA lacked jurisdiction to adjudicate state water rights. Pl.'s Mot. for Clarification and/or Mot. for Recons. at 18; Tr. at 5–6 (Feb. 2, 2009). Second, Plaintiff asserted that the existence of any water right necessitates the existence of a right-of-way permitting the owner of the water right to exercise that right. Tr. at 9–12 (Feb. 2, 2009).

In response, the Government argued that the IBLA decision is valid and enforceable against Underwood and that Underwood is collaterally estopped from arguing that its alleged water right provides it a right-of-way over federal land. Def.'s Opp'n to Pl.'s Mot. for Clarification and/or Mot. for Recons. and Def.'s Cross–Mot. for Recons. of its Mot. for Summ. J. ("Def.'s Opp'n") at 11–12.[10] The Government also sought summary judgment. *Id.* at 11.

### *Discussion*

### *Reconsideration Standard*

Rule 59 of the Rules of the Court of Federal Claims ("RCFC") states that a motion for reconsideration may be granted:

(A) for any reason for which a new trial has heretofore been granted in an action at law in federal court;

(B) for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or

(C) upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States.

To prevail under this rule, the moving party must show that an intervening change in controlling law has occurred or that evidence not previously available has become available, or that reconsideration is necessary to prevent manifest injustice. *Prati v. United*

*States,* 82 Fed.Cl. 373, 376 (2008) (citing *Bishop v. United States,* 26 Cl.Ct. 281 (1992)).

The decision to grant or deny a motion for reconsideration "lies largely within the discretion" of the Court. *Yuba Natural Res. Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir.1990). However, a party may not prevail on a motion for reconsideration "by raising an issue for the first time on reconsideration when the issue was available to be litigated at the time the complaint was filed." *Matthews v. United States,* 73 Fed. Cl. 524, 525–26 (2006) (citing *Lamle v. Mattel, Inc.,* 394 F.3d 1355, 1359 n. 1 (Fed.Cir. 2005)); *see also Bluebonnet Savings Bank v. United States,* 466 F.3d 1349, 1361 (Fed.Cir. 2006) (holding that "an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived"); *Corrigan v. United States,* 70 Fed. Cl. 665, 669 (2006) (denying reconsideration "[b]ecause plaintiff uses the same facts on which to base his new legal theories, he could have argued these new legal theories at the summary judgment stage"); *Seldovia Native Ass'n v. United States,* 36 Fed.Cl. 593, 594 (1996) (holding that a motion for reconsideration "should not be based on evidence that was readily available at the time the motion was heard").

### *Summary Judgment Standard*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). A fact is material if it may affect the outcome of the suit. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party bears the initial burden of proof and may discharge its burden by dem-

---

**10.** The Government also asserted that based upon the IBLA decision Underwood did not own the water rights in question at the time of the taking, and so lacks standing to sue. Def.'s Opp'n at 16–19. The IBLA concluded that Bowman owned the water rights as of the date of its decision on December 14, 2001, and that Bowman's 1995 application to the state of Nevada to

transfer those rights to Wilson and/or Underwood had not been approved at that time. 156 IBLA at 90–91. Plaintiff alleged that this taking occurred in 2000. As such, the IBLA decision found that Underwood was not the owner of the water rights at that time. However, Plaintiff's takings claim also encompasses the alleged right-of-way that the IBLA determined did not exist.

onstrating an absence of evidence to support the opposing party's case. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed.Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### Plaintiff Presents No Basis for Reconsideration [11]

In 2007, this Court stayed the proceedings in this case to allow Plaintiff's predecessors-in-interest to challenge the IBLA's adverse ruling in the District Court. However, this Court recognized that if the "IBLA determination is upheld by the District Court, there can be no taking here." *Underwood*, 79 Fed. Cl. at 497 n. 20. Although Wilson and Bowman filed a complaint in the District Court of Nevada last year to challenge the IBLA's decision, the District Court did not overturn that decision, finding instead that Wilson and Bowman's challenge was barred under principles of res judicata.

In seeking reconsideration, Plaintiff raises for the first time the argument that the IBLA decision is void because the IBLA lacked jurisdiction over state water rights. However, as explained in this Court's earlier decision, this Court lacks jurisdiction to declare the IBLA decision void. Moreover, Underwood's motion is not based on any change in law or new evidence. In fact, the only change in the law governing this case is the ruling by the District Court which leaves the IBLA decision in full force and effect. The District Court dismissed what it deemed was Wilson and Bowman's second attempt to challenge the IBLA decision under the APA as barred under principles of res judicata. The District Court noted that it considered but dismissed these plaintiffs' first APA challenge because their quiet title suit provided their exclusive remedy. *Wilson and Bowman II*, 07–cv–612 (D.Nev.); Tr. at 13 (Oct. 30, 2008).

Plaintiff also contends that the existence of any water right necessarily created a right-of-way on federal lands to reach and extract that water. However, this argument was squarely rejected by the IBLA, which determined that any right-of-way under the 1866 Act had been extinguished and that Wilson and Bowman had trespassed on federal land. Because the IBLA's decision was not disturbed by the Nevada District Court, Plaintiff is collaterally estopped from challenging the IBLA's determinations in this forum. The application of collateral estoppel here also warrants entry of summary judgment for Defendant that there was no taking.

### Plaintiff Is Collaterally Estopped From Arguing that It Owned a Right-of-Way that Entitled It to Build a Water Diversion Structure on Public Lands

■ Under the doctrine of collateral estoppel, also known as issue preclusion, "a judgment on the merits in a first suit precludes litigation in a second suit of issues actually litigated and determined in the first suit." *In re Freeman*, 30 F.3d 1459, 1465 (Fed.Cir.1994). The underlying rationale for issue preclusion is that a party or its privy that "has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over and over again." *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983) (citing *Warthen v. United States*, 157 Ct.Cl. 798, 800 (1962)) (other citations omitted). Issue preclusion is designed to "relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

■ In *U.S. v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), the Supreme Court recognized that collateral estoppel or issue preclusion applies to findings in administrative proceedings where the administrative body was "acting in a judicial capacity and re-

11. Although Plaintiff characterizes its motion as a motion for "clarification" as well as for reconsideration, Plaintiff does not identify what it deems unclear in the Court's opinion and does not seek clarification of any aspect of the Court's decision. Rather, Plaintiff seeks relief inconsistent with the Court's earlier ruling—vacatur of the IBLA decision, a remedy clearly outside this Court's jurisdiction.

solved disputed issues of fact properly before it which the parties [had] an adequate opportunity to litigate." 384 U.S. at 421, 86 S.Ct. 1545 (citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940)); *see also Kroeger v. U.S. Postal Serv.*, 865 F.2d 235, 239 (Fed.Cir.1988) (applying collateral estoppel to an administrative board's decision); *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).

■■■ As the Court recognized in *Klump v. United States*, 38 Fed.Cl. 243 (1997), the IBLA process meets the procedural requisites to accord an administrative decision collateral estoppel effect under *Utah Construction & Mining*. There, the Court of Federal Claims afforded the IBLA decision preclusive effect, stating "in evaluating plaintiff's claim of a Fifth Amendment taking, the court must assume that the IBLA's conclusions are correct." *Id.* at 248. This rationale applies with equal force here because the IBLA was clearly acting in a judicial capacity—resolving multiple issues surrounding the existence of a right-of-way and setting forth detailed findings of fact based upon a fully-developed record and conclusions of law premised on statutes, administrative decisions, and regulations.

■■ Under the principle of collateral estoppel, a party is precluded from relitigating issues if the following factors are met:

(1) the issue presented in the second action must be identical to one decided in the first action; (2) the issue must have been actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action.

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed.Cir.2001).

## The Identical Issue Was Actually Litigated Before the IBLA

■■ The first factor requires this Court to analyze "whether the point or question presented for determination in the subsequent action is the same as that litigated and determined in the original action." *United States v. Moser*, 266 U.S. 236, 241, 45 S.Ct. 66, 69 L.Ed. 262 (1924). An issue has been " 'actually litigated' if the parties properly raised it in their pleadings, submitted it for determination by" the tribunal, and the tribunal determined it. *Williams v. United States*, 86 Fed.Cl. 594, 603 (2009) (citing *Banner v. United States*, 238 F.3d 1348, 1354 (Fed.Cir.2001) (citing Restatement (Second) of Judgments § 27 cmt.d)). Even if the relief in the second suit is requested on a different basis from that in the first suit, collateral estoppel applies where " 'the question upon which the recovery of the second demand depends has, under identical circumstances and conditions, been previously concluded by a judgment between the parties or their privies.' " *Williams*, 86 Fed.Cl. at 602 (quoting *New Orleans v. Citizens' Bank*, 167 U.S. 371, 396, 17 S.Ct. 905, 42 L.Ed. 202 (1897)).

■■■ The issue underlying Plaintiff's takings claim is whether its predecessors-in-interest had a valid right-of-way entitling them to build the water diversion structure on federal land. This issue was "actually litigated" and adjudicated before the IBLA. Before the IBLA, Wilson and Bowman claimed to have a right-of-way that permitted them to build the tire dam on federal land. The IBLA, in a thorough decision, determined that Wilson and Bowman had no such property right, unequivocally ruling "[t]here is ... no doubt that there was no right-of-way authorizing the diversion structure in effect." 156 IBLA at 90. The IBLA stated: "[a]lthough appellants refer to an existing 'easement' and 'right-of-way' that assertedly entitle them to place the structure on public lands, they present no evidence on appeal of the existence of such an easement or right-of-way deriving either from State or Federal law." *Id.* at 95.

## *The Finding That There Was No Right-of-Way Was Necessary to IBLA Decision*

■■ As the Federal Circuit recognized in *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, "the requirement that a finding be 'necessary' to a judgment does not mean that the finding must be so crucial that, without it,

the judgment could not stand. Rather, the purpose of the requirement is to prevent the incidental or collateral determination of a nonessential issue from precluding reconsideration of that issue in later litigation." 723 F.2d 1566, 1571 (Fed.Cir.1983) (internal citations omitted).

■ The finding that Wilson and Bowman did not have a right-of-way that entitled them to build a tire dam on public lands was unquestionably necessary to the ultimate decision of the IBLA as it was pivotal to the IBLA's legal conclusion that Wilson and Bowman trespassed on public lands and were liable for trespass damages.

### Underwood Through Its Owner, President and Sole Shareholder, Dalton Wilson, Had a Full and Fair Opportunity to Litigate the Issue in the IBLA Proceeding

■ Finally, in determining whether Underwood had a "full and fair opportunity" to litigate the issue before the IBLA, this Court evaluates: " '(1) whether there were significant procedural limitations in the prior proceeding, (2) whether [Wilson, as Underwood's owner and predecessor-in-interest] had an incentive to litigate fully the issue, and (3) whether effective litigation was limited by the nature or relationship of the parties.' " *Williams,* 86 Fed.Cl. at 603 (quoting *Corrigan,* 82 Fed.Cl. at 311 (quoting *Banner,* 238 F.3d at 1354; citing *Shell Petroleum, Inc. v. United States,* 319 F.3d 1334, 1340 (Fed.Cir.2003))). Wilson did not encounter any significant procedural limitations during the IBLA proceeding and presumably had a strong incentive to litigate fully the issue of his ownership of the right-of-way because it was necessary to the determination of whether he would be able to continue diverting water or be liable for damages in trespass. Although he was not represented by counsel, Mr. Wilson's status as a pro se plaintiff did not limit his ability to litigate his IBLA appeal effectively given the nature and extent of his arguments as recounted in the IBLA decision, and his alignment of interest with that of Bowman who was represented by counsel. Consequently, Wilson had a full opportunity to litigate these issues before IBLA without any impediment to a fair and effective adjudication. *See Shell Petroleum,* 319 F.3d at 1340.

■ The fact that only Underwood's predecessors-in-interest, Bowman and Wilson, not Underwood itself, litigated the IBLA action does not alter the preclusive effect of the IBLA decision. The Supreme Court has explained the bases for the application of collateral estoppel to a nonparty in prior litigation, such as Underwood. *Taylor v. Sturgell,* ––– U.S. ––––, 128 S.Ct. 2161, 2171–73, 171 L.Ed.2d 155 (2008). As the Court stated in *Taylor:*

> [W]e have often repeated the general rule that "one is not bound by a judgment in *personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."
>
> . . . .
>
> Though hardly in doubt, the rule against nonparty preclusion is subject to exceptions. For present purposes, the recognized exceptions can be grouped into six categories.

128 S.Ct. at 2171–72.

■ Three of the exceptions articulated by the Supreme Court in *Taylor* apply here. First, "nonparty preclusion may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment." *Taylor,* 128 S.Ct. at 2172 (internal citations omitted). Qualifying relationships include preceding and succeeding owners of property. *Id.* (citing Restatement (Second) of Judgments §§ 43–44, 52, 55). Here, Bowman and Wilson were the preceding owners of the alleged right-of-way.

■ Second, the Supreme Court recognized an exception where a nonparty was "adequately represented by someone with the same interests who [wa]s a party" to the suit. *Taylor,* 128 S.Ct. at 2172 (quoting *Richards v. Jefferson Cty., Al.,* 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996)). Underwood's interest in the issue of ownership of the right-of-way is coextensive with that of Dalton Wilson, who fully represented that interest before the IBLA. Here, Underwood's property interests are inextricably

intertwined with those of Dalton Wilson. As Underwood's president, sole employee, and sole shareholder, Wilson is the alter ego of Underwood. For purposes of issue preclusion, judgments against the owner of a closely held corporation are binding on the corporation. The Restatement (Second) of Judgments explains:

> When the corporation is closely held ... interests of the corporation's management and stockholders and the corporation itself generally fully coincide.... For the purpose of affording opportunity for a day in court on issues contested in litigation, however, there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct. On the contrary, it may be presumed that their interests coincide and that one opportunity to litigate issues that concern them in common should sufficiently protect both.

Restatement (Second) of Judgments § 59(e) cmt. e.

■■■ Third, a nonparty is bound by a judgment if it "assume[d] control" over the litigation in which that judgment was rendered. *Taylor*, 128 S.Ct. at 2173 (citing *Montana*, 440 U.S. at 154, 99 S.Ct. 970). *See also Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262, n. 4, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961). Here, Underwood's principal, Wilson, clearly assumed control over the IBLA litigation.

Thus, all three grounds for application of collateral estoppel to a nonparty are present here. Accordingly, because the IBLA resolved the issue of whether Plaintiff's predecessors-in-interest owned a property right that entitled them to build the tire dam, Plaintiff may not relitigate this issue in this forum. Because Underwood has not established a property interest in the right-of-way, its takings claim must fail.[12]

---

12. In an apparent effort to satisfy another basis for reconsideration, Underwood includes in its Motion a section titled "Newly Discovered Evidence," Pl.'s Mot. for Clarification and/or Recons. 7–8, citing two items: a "Claim to Possessory Interests" and a series of United States Department of Agriculture Technical Bulletins. However, neither of these items constitutes new evidence. Both documents were in existence pri-

*Conclusion*

1. Plaintiff's Motion for Clarification and/or Reconsideration is **DENIED.**

2. Defendant's Motion for Reconsideration is **GRANTED.**

3. Defendant's Motion for Summary Judgment is **GRANTED.**

or to this Court's earlier ruling, and Plaintiff does not state why they were not reasonably discoverable through due diligence prior to this Court's previous ruling. *See Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1329 (Fed.Cir.2001) (finding that the appellant had constructive possession of evidence and, thus, could not obtain relief on the basis of newly discovered evidence).